**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AARON MCCULLOUGH-BRADSHAW, | Civil Action No. |
| Plaintiff, | Judge: |
| vs. | |
| CITY OF CHICAGO, SERGEANT KENNETH MESCALL, STAR NUMBER 848, SERGEANT GEORGE GRANIAS, STAR NUMBER 1731, JULIO CASTANEDA, STAR NUMBER 17665, ILIA ACEVEDO, STAR NUMBER 10955, MARCO CALDERON, STAR NUMBER 14850, JANET CORTEZ, STAR NUMBER 11573, ERIK MEJIA, STAR NUMBER 14998, CHARLES ALVISO, STAR NUMBER 15672, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Aaron McCullough-Bradshaw, by and through his undersigned counsel, alleges the following against Defendants City of Chicago and Chicago Police Department employees: Sergeant Kenneth Mescall, Star Number 848, Sergeant George Granias, Star Number 1731, Julio Castaneda, Star Number 17665, Ilia Acevedo, Star Number 10955, Marco Calderon, Star Number 14850, Janet Cortez, Star Number 11573, Erik Mejia, Star Number 14998, and Charles Alviso, Star Number 15672.

## NATURE OF ACTION

1.     The civil rights violations in this case stem from police misconduct, including unlawful seizures, the use of excessive and unjustified force, and a wrongful prosecution, all of which were caused by the unlawful customs and practices of the City of Chicago. These actions were taken by the City of Chicago and the named police officers ("Defendant Officers" and,

together with the City of Chicago, "Defendants"), who carried out this misconduct while purporting to serve an order of protection on Mr. McCullough-Bradshaw ("Mr. Bradshaw") on September 26, 2022. Defendants illegally seized Mr. Bradshaw, used excessive force in furtherance of their arrest by tasing Mr. Bradshaw in the chest, and caused his unlawful detention and prosecution on baseless charges, subjecting him to improper confinement and GPS monitoring even after the order of protection he was erroneously accused of violating had terminated. At all relevant times, Defendants did not have lawful justification to arrest, charge, or cause Mr. Bradshaw to be detained and prosecuted for the alleged crime of violating an order of protection, and further, used force that was objectively unreasonable under the circumstances.

## PARTIES

2.      Mr. Bradshaw is a citizen of the United States who, at all relevant times, was a resident of Cook County, Illinois and the Northern District of Illinois.

3.      Defendant KENNETH MESCALL, Star Number 848, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

4.      Defendant GEORGE GRANIAS, Star Number 1731, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

5.      Defendant JULIO CASTANEDA, Star Number 17665, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

6.      Defendant ILIA ACEVEDO, Star Number 10955, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. She engaged in the conduct complained of in the course and scope of her employment and under color of law.

7.      Defendant MARCO CALDERON, Star Number 14850, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

8.      Defendant JANET CORTEZ, Star Number 11573, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. She engaged in the conduct complained of in the course and scope of her employment and under color of law.

9.      Defendant ERIK MEJIA, Star Number 14998, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

10.     Defendant CHARLES ALVISO, Star Number 15672, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department. He engaged in the conduct complained of in the course and scope of his employment and under color of law.

11.     The Defendant Officers are sued in their individual capacities.

12.     Defendant CITY OF CHICAGO (the "City") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of the Defendant Officers.

**JURISDICTION AND VENUE**

13.     Mr. Bradshaw brings his claims under 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution.

14.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Further, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Mr. Bradshaw's claim arising under Illinois state law.

15.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (b)(2) in "a judicial district where any defendant resides, if all defendants are residents of the State in which the district is located" or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

16.     Upon information and belief, all individual Defendant Officers reside in the State of Illinois and the Northern District of Illinois. The events giving rise to the claim involved in this case occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

17.     Between September 24, 2022 and September 26, 2022, Defendant Officers exceeded the bounds of their lawful authority by improperly serving and enforcing an order of protection against Mr. Bradshaw which had been obtained by Mr. Bradshaw's mother, who suffers from a mental illness. As described herein, Defendants' misconduct included unlawfully seizing Mr. Bradshaw, using excessive force on Mr. Bradshaw, and pursuing baseless charges against Mr. Bradshaw, which led to unlawful pre-trial detention and prosecution on the charge of violation of an order of protection—a charge for which Defendants knew there was no probable cause. These violations of Mr. Bradshaw's rights were caused by the unlawful customs and practices of the City of Chicago and its police department.

## I.     The September 24, 2022 Incident

18.     During the relevant time, Mr. Bradshaw co-leased an apartment with his mother, Lonnett McCullough, at 1910 W. Crystal St., Chicago, Illinois. (the "Crystal Street Residence").

19.     On information and belief, Ms. McCullough has been diagnosed with a mental illness. In the years leading up to the incidents described in this complaint, Ms. McCullough suffered various mental health episodes during which she called police and falsely reported domestic disputes involving Mr. Bradshaw, Mr. Bradshaw's brother, and others.

20.     The Chicago Police Department ("CPD") is familiar with Ms. McCullough's history of false police reports. Police responded to Ms. McCullough's reports by sending officers to Ms. McCullough's and Mr. Bradshaw's residence on at least 15 occasions since 2015. None of Ms. McCullough's complaints were determined to be credible or led to charges against Mr. Bradshaw.

21.     On September 24, 2022, Ms. McCullough, contacted the CPD, complaining of another purported domestic dispute between her and Mr. Bradshaw.

22.     Ms. McCullough falsely claimed that Mr. Bradshaw had damaged some furniture in the home and made a hole in the wall in the course of an argument between her and Mr. Bradshaw.

23.     The same day, Defendant Officers CALDERON and CORTEZ reported to the Crystal Street Residence in response to Ms. McCullough's call.

24.     Upon arriving at the residence, Defendant Officers CALDERON and CORTEZ interviewed Ms. McCullough outside of Mr. Bradshaw's presence.

25.     Defendant Officers CALDERON and CORTEZ inspected the residence and did not find any evidence of the property damage Ms. McCullough had reported to the CPD earlier that day.

26.     As with prior incidents in which Ms. McCullough falsely made allegations to the CPD about Mr. Bradshaw on unsubstantiated claims, this incident did not result in an arrest, an incident report, or any other formal write-up by the CPD.

## II.     The Order of Protection

27.     Following the events of September 24, 2022, Ms. McCullough sought and obtained an *ex parte* Emergency Order of Protection (the "EOP") against Mr. Bradshaw based on the same unfounded allegations she had made to the CPD two days prior.

28.     Ms. McCullough did not tell Mr. Bradshaw about the EOP and Mr. Bradshaw had no notice of it when it was entered on September 26, 2022. A copy of the EOP is attached to this complaint as Exhibit 1.

29.     The terms of the EOP provided that certain of its remedies could be enforced by the police while other remedies required court enforcement. The terms of the EOP were clear and unambiguous and would have been immediately evident to anyone who read the EOP.

30.     The police-enforced remedies identified in the EOP were strictly limited in scope and did not grant police officers authority to confiscate any of Mr. Bradshaw's belongings. The EOP permitted police to intervene only on an emergency basis to prevent Mr. Bradshaw from harassing, abusing, or communicating with Ms. McCullough or from staying at their shared residence. However, by the terms of the EOP, Mr. Bradshaw was allowed to enter the residence, with police supervision, to retrieve his personal belongings.

31.     The EOP's more extensive remedies, such as the transfer of house keys and restrictions on personal property, were expressly noted in the EOP as remedies that could only be enforced by further action of the court. The EOP did not provide the police with any authority to intervene in such matters.

32.     In Cook County, emergency orders of protection are routinely entered on an *ex parte* basis. Then, the order of protection either (1) expires by operation of law on a date certain, or (2) after proof of service of the order of protection has been filed with the court and the complainant's allegations have been substantiated at a plenary hearing at which the respondent has an opportunity to be present, the court may enter a plenary order of protection with the potential duration of a year or more.

33.     Any court-enforced remedies specified in an order of protection are typically addressed by the court at the plenary hearing, which can only take place with notice to and service upon the respondent.

34.     Under the EOP entered against Mr. Bradshaw, only the court, as opposed to any law enforcement agency including the CPD, was empowered and authorized by law to enforce the transfer of house keys. The EOP did not order the immediate transfer of Mr. Bradshaw's keys but, rather, specifically stated that the court would determine at a later date whether Mr. Bradshaw would be required to transfer his keys.

35.     Likewise, under the express terms of the EOP, only the court had the power to enforce any other transfers of Mr. Bradshaw's personal property or determine Mr. Bradshaw's right to occupy the Crystal Street Residence, which he shared with Ms. McCullough as co-lessee. Thus, actions to enforce the transfer of any personal property or enforce occupancy rights could be taken only once a further court order was issued or a plenary order of protection was granted, neither of which had occurred by September 26, 2022.

36.     The police were not legally authorized to execute any of the remedies that the EOP stated were to be court-enforced.

37.     The EOP provided that a hearing on the matter was to occur on October 17, 2022, at which time the EOP would terminate and the court would determine whether to grant a plenary order of protection.

### III.     The September 26, 2022 Incident

38.     Immediately after obtaining the EOP on September 26, 2022, Ms. McCullough called the CPD claiming that Mr. Bradshaw had violated the EOP. As with Ms. McCullough's prior calls to the CPD, this claim was not accurate and, at this time, Mr. Bradshaw had not yet been served with or received notice of the EOP.

39.     In response to Ms. McCullough's call, approximately twelve CPD officers in multiple vehicles arrived at the Crystal Street Residence.

40.     Among the responding officers were Defendant Officers CALDERON and CORTEZ, the same officers who responded to Ms. McCullough's call two days before on September 24, 2024 and concluded at that time that her claims were not credible and did not justify an arrest or formal charge against Mr. Bradshaw.

41.     Upon their arrival, the officers spoke to Ms. McCullough and confirmed that Mr. Bradshaw had not yet been served with the EOP.

42.     Ms. McCullough provided the Defendant Officers with a copy of the EOP which had been entered that morning.

43.     Defendant Officers, including but not limited to Defendant Officer CALDERON, ran a search of Mr. Bradshaw on their in-car computers.

44.     Defendant Officers had reasonable access to information, including Mr. Bradshaw's criminal history/record, that would have confirmed that Mr. Bradshaw had no prior convictions nor any arrests for any violent crime.

45.    Approximately half an hour after the first of Defendant Officers arrived on the scene, Defendant Officers MESCALL and GRANIAS arrived.

46.    Upon Defendant Officer MESCALL's arrival, Defendant Officer CALDERON informed Defendant Officer MESCALL that he had responded to Ms. McCullough's unfounded 911 call two days earlier and that Ms. McCullough's claims that Mr. Bradshaw had behaved aggressively or violently were not credible.

47.    While this was occurring, Mr. Bradshaw was inside the Crystal Street Residence preparing for work and waiting for his girlfriend (now-wife) to arrive with takeout food. Mr. Bradshaw was unaware that Ms. McCullough had called the police or that the Defendant Officers were outside the Crystal Street Residence.

48.    As Mr. Bradshaw exited the Crystal Street Residence to meet his girlfriend who had just arrived with food, Defendant Officer GRANIAS followed him down the sidewalk, initiating the first confrontation.

49.    Without identifying himself or announcing his purpose, Defendant Officer GRANIAS made physical contact with Mr. Bradshaw by grabbing him around his midsection and blocking Mr. Bradshaw's path.

50.    Mr. Bradshaw was surprised by this and withdrew, asking Defendant Officer GRANIAS to stop touching him. In response, additional Defendant Officers cornered Mr. Bradshaw against a wall restricting his freedom and preventing him from leaving.

51.    It was only then that Defendant Officer MESCALL informed Mr. Bradshaw of the Defendant Officers' alleged reason for apprehending Mr. Bradshaw. Defendant Officer MESCALL explained that an EOP had been issued against Mr. Bradshaw and read him portions of the EOP. This was the first time Mr. Bradshaw learned of the EOP.

52.     Defendant Officer MESCALL indicated that Mr. Bradshaw needed to stay away from the Crystal Street Residence as a result of the EOP.

53.     In the course of this encounter, the Defendant Officers did not take appropriate steps to properly serve the EOP on Mr. Bradshaw either via "Short Form" service or full service.

54.     None of the Defendant Officers, including the sergeants, Defendant Officers MESCALL and GRANIAS, obtained or prepared the official standard documents to effect "Short Form" service of the EOP pursuant to CPD directives.

55.     None of the Defendant Officers, including the sergeants, Defendant Officers MESCALL and GRANIAS, obtained a full EOP service packet, which ordinarily includes the complainant's supporting affidavit.

56.     At no point on September 26, 2022 or afterwards did any of the Defendant Officers file any form of proof of service of the EOP on Mr. Bradshaw.

57.     As Defendant Officer MESCALL read the EOP to Mr. Bradshaw, the Defendant Officers continued to surround Mr. Bradshaw and remained even after Defendant Officer MESCALL was finished reading, thereby preventing Mr. Bradshaw from leaving.

**A.      Unlawful Seizure 1: Officer Mescall's Unauthorized Lunge for Mr. Bradshaw's Keys**

58.     Defendant Officers first seized Mr. Bradshaw at the outset of the incident.

59.     While the Defendant Officers read Mr. Bradshaw the EOP, Mr. Bradshaw was surrounded by multiple Defendant Officers and reasonably believed he was not free to leave.

60.     Mr. Bradshaw called Defendants' attention to Ms. McCullough's history of calling the CPD with unfounded allegations, which at least officers CALDERON and CORTEZ were familiar with. While Defendant Officers indicated that they understood this history to some extent, they claimed to be acting pursuant to the court-ordered EOP. This was not accurate, as the incident

had been precipitated by Ms. McCullough's call to the CPD and, prior to arriving on the scene and speaking with Ms. McCullough, the Defendant Officers were not aware of the EOP.

61.     At no point during their encounter with Mr. Bradshaw did the Defendant Officers state that Mr. Bradshaw was in violation of the EOP or that he had done anything to justify being placed under arrest for such a violation.

62.     Mr. Bradshaw told the Defendant Officers he was preparing for work. His eight-hour shift at Walgreens was scheduled to begin shortly, and he would not finish his shift until approximately midnight, which indicated to Defendant Officers that he would not be immediately returning to the residence.

63.     Mr. Bradshaw did not attempt to re-enter the Crystal Street Residence at that time or any time after receiving notice of the EOP on September 26, 2022.

64.     After some discussion about the merits of the EOP and what it prohibited Mr. Bradshaw from doing, the Defendant Officers forcibly attempted to seize Mr. Bradshaw's key chain, which was visible and in his hands.

65.     In the course of this encounter, Defendant Officer MESCALL threw his clipboard containing the EOP to the ground and grabbed Mr. Bradshaw's hand in an attempt to confiscate his key chain.

66.     The Defendant Officers did not have probable cause or reasonable suspicion to believe that Mr. Bradshaw committed, was committing, or was about to commit any crime or even that he was in violation of the EOP.

67.     When Defendant Officer MESCALL did not immediately gain control of the key chain, at least four other Defendant Officers closed in on Mr. Bradshaw, restraining him.

B.    **Unlawful Seizure 2: Handcuffing, Taser Threat, and Use of Taser Against Mr. Bradshaw**

68.    While the Defendant Officers forcibly restrained Mr. Bradshaw, Defendant Officer CASTANEDA handcuffed one of Mr. Bradshaw's hands, while the others grabbed his arms, shoulders, and torso.

69.    Less than a minute passed between when the Defendant Officers physically seized Mr. Bradshaw and when Defendant Officer CORTEZ gained control of Mr. Bradshaw's key chain. Although Defendant Officer CORTEZ already had control of Mr. Bradshaw's key chain, Defendant Officer MESCALL, who was approximately two to three feet from Defendant Officer CORTEZ and other Defendant Officers who were together restraining and controlling Mr. Bradshaw and had plain view of this restraint and control, shouted "taser" several times.

70.    Defendant Officer MESCALL deployed his taser on Mr. Bradshaw's chest from close range. It appears that the taser malfunctioned.

71.    None of the Defendant Officers made an effort to inform Defendant Officer MESCALL that Mr. Bradshaw's keys were secured or otherwise stop Defendant Officer MESCALL from continuing his effort to tase Mr. Bradshaw who was already detained and under restraint by no less than three Defendant Officers.

72.    Defendant Officer MESCALL proceeded to deploy his taser a second time, again aiming it at Mr. Bradshaw's chest from close range. This time, the taser prongs made contact with Mr. Bradshaw's chest and the force of the taser brought Mr. Bradshaw to his knees.

73.    The prongs of the taser remained imbedded in Mr. Bradshaw's chest and needed to be surgically removed.

74.    After Mr. Bradshaw was tased, the Defendant Officers continued to restrain Mr. Bradshaw while he was on the ground. Mr. Bradshaw pleaded with the Defendant Officers to get

off of him, explaining that he had pre-existing issues with his legs, which were under pressure by the Defendant Officers' use of force. Mr. Bradshaw's cries and requests were disregarded.

75.     In addition to experiencing pain and mental anguish, Mr. Bradshaw's asthma was exacerbated, making it difficult for him to breathe.

### C.      Unlawful Seizure 3: Continued Threat of Taser Against Mr. Bradshaw

76.     Even though Mr. Bradshaw was already on the ground under the control of multiple Defendant Officers and Mr. Bradshaw's keys were by this point securely within the Defendant Officers' control, Defendant Officer MESCALL proceeded to point and place his taser against the back of Mr. Bradshaw's neck and head region.

### D.      Unlawful Seizure 4: Mr. Bradshaw Is Unreasonably Restrained at the Hospital

77.     Following this incident, Mr. Bradshaw was transported to Ascension Saint Mary Hospital where medical professionals assessed his injuries and surgically removed the taser prongs that were still embedded within Mr. Bradshaw's chest.

78.     The Defendant Officers present at the hospital acknowledged that Mr. Bradshaw posed no threat to them or hospital staff. Nonetheless, Mr. Bradshaw, who was seriously injured, was handcuffed to his hospital bed.

### E.      Unlawful Seizure 5 (continuing seizure): The Prosecution, GPS Monitoring, and Continued Surveillance of Mr. Bradshaw

79.     After receiving treatment, Mr. Bradshaw was processed and charged with misdemeanor violation of the EOP, misdemeanor assault, and misdemeanor resisting arrest.

80.     Mr. Bradshaw was transported to and held at the Cook County Jail overnight, where he was denied access to his asthma medication and deprived of his prescription glasses.

81. These deprivations prevented him from fully understanding or correcting important information, including the erroneous employment address listed by police officers on his GPS monitoring order, which later caused problems with his GPS monitoring.

82. Mr. Bradshaw appeared at a bond hearing on September 27, 2022. Following that hearing, Mr. Bradshaw was released from custody on bond subject to a requirement that he wear a GPS monitoring system which tracked his location to ensure he did not violate the EOP.

83. During the bond hearing, Mr. Bradshaw received a copy of the EOP. This was the first time the EOP was properly served on Mr. Bradshaw.

84. From September 27, 2023 until December 14, 2023, Mr. Bradshaw was under a continual unlawful seizure as a result of being subjected to GPS monitoring for violation of the EOP—a charge that unquestionably lacked probable cause.

85. The Defendant Officers' conduct in initiating charges against Mr. Bradshaw, and their unreasonable and unlawful conduct prior to charging him, caused this continuing or ongoing seizure.

86. On October 7, 2022, Mr. Bradshaw filed a motion to vacate the EOP.

87. On October 17, 2022, a hearing was held on the EOP; however, Mr. Bradshaw did not appear at the hearing because he was misinformed as to the date of the hearing by an officer of the court.

88. Consequently, the court entered default judgment for Ms. McCullough granting her a plenary order of protection and providing her with exclusive possession of the residence.

89. The plenary order was short lived (only lasting two days) because on October 19, 2022, Mr. Bradshaw successfully moved to reopen the proceedings and vacate the order of protection after clarifying the circumstances under which Mr. Bradshaw had not appeared.

90.     On December 14, 2022, the order of protection against Mr. Bradshaw was terminated and the civil case was dismissed.

91.     After the termination of the order of protection on December 14, 2022, Mr. Bradshaw continued to be subject to GPS monitoring even though the GPS monitoring system was intended to ensure he did not violate the EOP or the plenary order of protection that was in effect for two days.

92.     After the dismissal of the civil order of protection case, the prosecution still pursued criminal charges against Mr. Bradshaw.

93.     At a January 10, 2023 hearing on Mr. Bradshaw's charges, the court expressed dismay that the GPS monitoring had continued for nearly a month after the termination of the order of protection, calling it "appalling." A copy of the transcript from the January 10, 2023 hearing is attached to this complaint as Exhibit 2.

94.     At the January 10, 2023 hearing, in assessing the factual basis underlying the charges, the court stated that refusing to turn over keys pursuant to an emergency order of protection is "not even a violation" of an order of protection as it is "not even criminally enforceable to turn over keys" and further noted "[t]hat would be a finding of no probable cause. I'm baffled by that." Ex. 2 at 8:10-12, 12:2-13.

95.     Per the court's order at the January 10, 2023 hearing, Mr. Bradshaw was finally removed from GPS monitoring.

96.     The court scheduled a bench trial for Mr. Bradshaw's violation of the order of protection charge on March 20, 2023. At the scheduled bench trial, the prosecution determined it could not meet its burden as to the violation of the order of protection charge and dropped the charge as *nolle prosequi*.

97.     Following the March 20, 2023 hearing, the two remaining counts of resisting arrest and assault were transferred to a different judge and branch of the Cook County Circuit Court system.

98.     On April 17, 2023, the court struck the remaining two counts of resisting arrest and assault. That same day, the prosecution moved to reinstate the charges.

99.     On May 1, 2023, the court denied the prosecution's motion to reinstate the charges.

100.    No further charges or proceedings were initiated against Mr. Bradshaw.

101.    In total, Mr. Bradshaw was subject to wrongful prosecution without probable cause for more than seven months, including more than three months wrongfully on GPS monitoring. The prosecution caused damages and injury to Mr. Bradshaw.

**F.     The Harm to Mr. Bradshaw**

102.    As a direct result of the Defendants' unlawful conduct, Mr. Bradshaw suffered significant physical and emotional trauma as well as economic loss.

103.    The physical and emotional trauma caused to Mr. Bradshaw includes the significant physical and emotional pain and suffering that Mr. Bradshaw experienced while the Defendant Officers forcibly restrained him, tased him, and then continued to threaten to tase him during the September 26, 2022 incident. The Defendant Officers' misconduct placed Mr. Bradshaw in fear of his life as he expressed to Defendant Officers that he had pre-existing health conditions and that a taser could potentially kill him. In addition, among other trauma resulting from the Defendant Officers' conduct, Mr. Bradshaw:

> a)     suffered acute asthma symptoms that made it difficult for Mr. Bradshaw to breathe following his arrest. Mr. Bradshaw was denied access to his medically prescribed inhaler to treat the asthma symptoms he experienced following the encounter with the Defendant Officers. Mr. Bradshaw was not given his inhaler until after he was taken to the judge a day later;

b)      experienced exacerbations of his pre-existing progressive stress injuries to his legs, a condition he had been diagnosed with and for which he received physical therapy prior to the September 26, 2022 incident. Following the September 26, 2022 incident, Mr. Bradshaw felt uncomfortable returning to physical therapy because he was embarrassed and humiliated by the GPS monitor that he was wrongfully required to wear on his ankle. This contributed to exacerbations of his injuries and prolonged his recovery. To date, Mr. Bradshaw cannot stand for long periods of time and is required to take medication to control swelling of his legs. He must also wear special shoe insoles;

c)      was diagnosed with Complex Post-Traumatic Stress Disorder in December 2022 as a direct and proximate result of the events described in this complaint that transpired from September 26, 2022 until May 1, 2023 and began experiencing worsening symptoms which have interfered with his personal relationships and his ability to earn an income; and

d)      experienced and continues to experience considerable anxiety that interferes with his everyday life activities, including his employment. Mr. Bradshaw was diagnosed with anxiety disorder and has been prescribed medication for his anxiety at various times since the September 26, 2022 incident.

104.    While Mr. Bradshaw has attempted to address the impact of Defendant Officers' misconduct on his life, including by seeking out support groups and counseling, the toll of this misconduct continues to cause Mr. Bradshaw severe anxiety, which is often triggered simply when Mr. Bradshaw sees a police car or officer. Mr. Bradshaw never experienced these feelings towards law enforcement prior to the Defendant Officers' conduct on September 26, 2022.

105.    Finally, Mr. Bradshaw lost wages as a direct and proximate result of the physical and mental health issues he experienced and the multiple court appearances he had to make due to the Defendant Officers' conduct on September 26, 2022. Indeed, when Mr. Bradshaw returned to work within days of the incident, he was instructed to take a week off work because he appeared physically bruised and exhausted.

G.     **The Unconstitutional Patterns and Practices of the Chicago Police Department**

106.     The violations of Mr. Bradshaw's Fourth Amendment rights described above, including the multiple unlawful seizures, the excessive use of force against him, and his wrongful detention and prosecution without probable cause, were caused by the unconstitutional customs and practices deeply embedded within the CPD.

107.     Previously, the United States Department of Justice, Civil Rights Division, Special Litigation Section, and the United States Attorney's Office for the Northern District of Illinois, jointly initiated an investigation of the CPD to determine whether the CPD engages in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices facilitate or cause this pattern or practice.

108.     In 2017, the United States Department of Justice (the "DOJ") issued a report on its investigation of the CPD (the "DOJ Report"), and found that the CPD had patterns or practices of violating the Fourth Amendment. A copy of the DOJ Report is attached to this complaint as Exhibit 3.

109.     The DOJ Report highlighted that the CPD's procedures and processes for deterring or detecting officer misconduct and holding officers accountable were ineffective, contributing directly to the pattern of unconstitutional conduct observed within the CPD.

110.     The misconduct experienced by Mr. Bradshaw reflects a broader pattern within the CPD that has persisted despite numerous investigations, a federal consent decree, jury verdicts, numerous lawsuits, and public scrutiny from investigative bodies and members of the public.

*CPD's Failures to Detect, Deter, and Discipline Officer Misconduct*

111.     The DOJ Report confirmed that the CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they

-18-

violate the law or CPD policy and relayed that "Chicago's deficient accountability systems contribute to CPD's pattern or practice of unconstitutional conduct" pointing specifically to, among other things, CPD's systems for investigating police conduct and policies and practices that impede the investigation of officer misconduct. *See* Ex. 3 at 46-50.

112.    Defendant Officer MESCALL has had, at a minimum, 28 complaints made against him in the course and scope of his employment with the CPD and actions under color of law, including, among other things, use of force, verbal abuse, operation/personnel violations, lockup procedures violations, improper arrest, conduct unbecoming, and illegal search. These complaints were sustained at a very low rate.

113.    Notably, Defendant Officer MESCALL has been the subject of multiple complaints regarding the improper or unlawful use of a taser, as recently as 2021.

114.    Defendant Officer GRANIAS has had, at a minimum, 34 complaints made against him in the course and scope of his employment with the CPD and actions under color of law, including, among other things, use of force, verbal abuse, operation/personnel violations, improper arrest, conduct unbecoming, and illegal search. These complaints were sustained at a very low rate.

115.    In addition to the misconduct described *supra* in Paragraph 114, Defendant Officer GRANIAS was involved in an action in which he was alleged to have used excessive force against a handcuffed woman at a CPD station. The matter was settled for $185,000.

116.    Defendant Officer GRANIAS has also been the subject of multiple civilian complaints for excessive force involving the use of a weapon.

117.    Despite the dozens of complaints against just these two Defendant Officers, no meaningful actions were taken by the CPD to protect the public from their misconduct, including the misconduct described in this complaint.

118.    As it applies to Mr. Bradshaw, the CPD determined that Defendant Officer MESCALL's taser use in the September 26, 2022 incident was not in compliance with CPD policy and directives.

119.    Nonetheless, Defendant Officer MESCALL was not reprimanded or suspended for using force and a weapon in a manner that violated CPD policy and directives.

120.    Defendant Officer MESCALL has more use of force reports than 93% of CPD officers generally and more civilian complaints than 93% of CPD officers generally.

121.    Defendant Officer GRANIAS has more use of force reports than 99.8% of CPD officers generally and more civilian complaints than 86% of CPD officers generally.

122.    The City failed to exercise meaningful discipline, oversight, or scrutiny over the Defendant Officers and was deliberately indifferent to the plainly foreseeable risks of failing to have adequate disciplinary mechanisms and appropriate use of force training, particularly but not exclusively, given the disciplinary histories and prior litigation against Defendant Officers.

### *CPD's Training and Supervision Failures Concerning Use of Force and Taser Policy Violations*

123.    The DOJ Report also found that the CPD "does not provide officers with sufficient direction, supervision, or support to ensure lawful and effective policing." *See generally* Ex. 3 at 93-118.

124.    According to the DOJ Report, the CPD has "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." Ex. 3 at 93. Regarding training, the DOJ Report noted:

CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result.

*Id.* at 93-94.

125.    With respect to supervision, the DOJ Report explained:

Instead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, the City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result.

*Id.* at 105.

126.    Moreover, the DOJ report found that the CPD's supervision and training failures "have resulted in CPD engaging in a pattern or practice of using force in a manner that is unconstitutional, contrary to CPD policy, and unsafe." *Id.* at 23.

127.    Specifically with respect to the use of force, the DOJ's investigation revealed:

CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force. CPD often does not appropriately supervise officers to identify dangerous tactics or behaviors that may indicate officers need additional training or other intervention. CPD also does not review its force practices as a whole to identify problematic trends or patterns that endanger officers and others. When officers use force, CPD often does not adequately review those force incidents to determine whether the force used complied with the law or CPD policy, or whether the tactics the officer used were safe and effective.

*Id.* at 23.

128.    Additionally, the DOJ Report noted that the CPD has engaged in a pattern or practice of "using excessive force against people who do not present a threat and who are suspected only of low-level crimes or, in some cases, no crime at all." *Id.* at 32.

129.    The DOJ's investigation also revealed that CPD officers systematically "escalate encounters unnecessarily" and use "retaliatory force" against objecting citizens, such that the "use of unreasonable force to quickly resolve non-violent encounters is a recurrent issue at CPD" in part because "CPD's policy permits the use of Tasers in situations where it is unreasonable. . ." *Id.* at 33.

130.    In January 2019, the CPD and the City entered into a consent decree (the "Consent Decree") requiring them to reform law enforcement training, policies, and practices to ensure that the CPD performs constitutional and effective policing.

131.    The Consent Decree was premised in part upon a lawsuit by the State of Illinois against the City of Chicago, which outlined patterns of CPD officers using excessive force in violation of the law, deficiencies in training, supervision, and discipline, and the City's deliberate indifference to the repeated pattern of the CPD's excessive force.

132.    In the lawsuit underlying the Consent Decree, the State of Illinois alleged that:

> the City maintains a policy, custom, or practice of police conduct that violates federal and state law. This policy, custom, or practice includes a repeated pattern of using excessive force without legal justification . . . [and] has a disparate impact on the City's African American and Latino residents . . . . This policy, custom, or practice is further reflected in, and caused by, the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline.

Complaint ¶¶ 31-33, *State of Illinois v. City of Chicago*, No. 1:17-cv-06260 (Aug. 29, 2017), ECF No. 1. (cleaned up).

133.    Pursuant to the Consent Decree, a federal judge appointed an independent monitor to oversee, evaluate, and issue reports on the CPD's and the City's progress in meeting the requirements of the Consent Decree.

134.    The City agreed to attempt to meet all of the requirements of the Consent Decree within five years of its effective date. Consent Decree ¶ 714, *State of Illinois v. City of Chicago*, No. 1:17-cv-06260 (Jan. 31, 2019), ECF No. 703-1.

135.    In June 2020, the independent monitor overseeing the federal Consent Decree to reform the CPD reported that the CPD was not complying with its obligation to implement training that would ensure reasonable and constitutional use of force.[1]

136.    In a June 5, 2020 letter to the same independent monitor, commenting on the monitor's report, the Attorney General of Illinois wrote that "CPD continues to be reluctant to change its culture as it relates to use of force and to hold officers accountable for excessive force." The letter continued that the City's process with regard to use of force incidents was insufficiently focused on individual members rather than systemic changes, and that the Attorney General's Office had seen no evidence that CPD had made "any written Department-wide recommendations for substantive changes to CPD policy, tactics, equipment, or training" with respect to the use of force.[2]

---

[1] *Independent Monitoring Report 2*, CPD Consent Decree Independent Monitoring Team, at 11 (June 18, 2020), available at https://live-chicago-imt.pantheonsite.io/wp-content/uploads/2024/09/2020_06_18-Independent-Monitoring-Report-2-filed-1.pdf.

[2] Letter from Kwame Raoul, Attorney General of Illinois, to Margaret A. Hickey, Independent Monitor, Chicago Police Department Independent Monitoring Team (June 5, 2020), available at https://www.chicagopoliceconsentdecree.org/Page-Attachments/CPCD/Resources/IMR/2020.06.05-OAG-Comments-to-the-Second-Monitoring-Report-FINAL.pdf.

137.    On March 25, 2022, the Consent Decree was extended an additional three years because of "missed deadlines and lagging compliance."[3]

138.    As recently as June 2023, the independent monitor overseeing the federal Consent Decree noted that "CPD missed its intended timeline to update crucial use of force policies addressing Tasers."[4]

139.    The independent monitor additionally noted that CPD had only achieved full compliance with six percent of its obligations under the Consent Decree.[5]

140.    The Illinois deputy attorney general charged with overseeing the Consent Decree said around this time that the City and the CPD had "resisted commonsense" proposals to fix major problems.[6]

141.    On June 14, 2023, the City's former Inspector General, Joe Ferguson, filed a public comment in the Consent Decree litigation. Ferguson expressed frustration with the City's halting progress of compliance with the Consent Decree, and called for a "hard reset" and a "fresh start" for oversight of the decree, "because Consent Decree implementation and monitoring is a faltering undertaking both in substantive accomplishment and in transparency. In the absence of a hard methodological and operational reset, I believe the Consent Decree is at high risk of failing to

---

[3] *See* Matt Masterson, *Chicago Police Extending Consent Decree Timeline by 3 Additional Years*, WTTW News, Mar. 25, 2022, available at https://news.wttw.com/2022/03/25/chicago-police-extending-consent-decree-timeline-3-additional-years.

[4] *Independent Monitoring Report 7*, CPD Consent Decree Independent Monitoring Team, at 7 (June 29, 2023), available at https://cpdmonitoringteam.com/wp-content/uploads/2024/04/2023.06.29-Independent-Monitoring-Report-7-filed.pdf.

[5] *Id.* at 4.

[6] Lehman, Charles Fain, *Is the Chicago Consent Decree Working? Consent Decrees for Police Reform: The Chicago Experience*, Manhattan Institute, July 20, 2023, available at https://manhattan.institute/article/is-the-chicago-consent-decree-working-consent-decrees-for-police-reform-the-chicago-experience.

achieve its objectives." Comment at 1, *State of Illinois v. City of Chicago*, No. 1:17-cv-06260 (June 14, 2023), ECF No. 1092.

142.    Ferguson continued, "We of course know . . . that progress has not come close to meeting the agreed timetables set forth in the Consent Decree itself. While some slippage was to be expected, nothing of the actual magnitude experienced was anticipated." *Id.* at 2.

143.    In May 2023, the Office of the Inspector General ("OIG") reported that "[s]tructural failures in Chicago's police accountability system allow CPD members with Rule 14[7] histories to remain in positions with duties that depend upon their truthfulness and credibility." Despite the fact that "[t]he truthfulness and credibility of police officers is foundational to the fair administration of justice, and to CPD's effectiveness as a law enforcement agency," and despite public statements by the CPD and the Civilian Office of Police Accountability ("COPA"), that separation (i.e., termination of employment) is the appropriate disciplinary penalty when a member is found to have violated Rule 14, the CPD, COPA, and Police Board practices allow for CPD members with Rule 14 histories to remain employed, often assigned to positions such as Beat Officer or Detective.[8]

144.    In August 2023, OIG found structural problems inhibiting the CPD's ability to enforce Rules 21 and 22, which require officers to report misconduct by their colleagues. Among other problems, OIG found that, while the CPD informs members of their duty to report misconduct during recruit training, it does not formally reinforce this requirement through ongoing training or messaging. OIG further found that COPA and the CPD Bureau of Internal Affairs

---

[7] Rule 14 prohibits false statements by police officers.

[8] Debra Witzburg & Tobara Richardson, *Enforcement of the Chicago Police Department's Rule Against False Reports*, City of Chicago Office of Inspector General (May 25, 2023), available at https://igchicago.org/wp-content/uploads/2023/05/Enforcement-of-CPDs-Rule-Against-False-Reports-%E2%80%93-Rule-14.pdf.

("BIA") do not consistently pursue violations of Rule 21 and Rule 22, which compromises enforcement of the rules, and inhibits any thorough analysis of failures to report—on the part of individual members or agency-wide.[9]

145.     The City and the CPD have failed to act to remedy the patterns of abuse described in the instant complaint and the DOJ's report, despite actual knowledge of the same on the part of departmental supervisory personnel and decision-makers, thereby causing the types of injuries and damages alleged herein by Plaintiff.

146.     The foregoing acts, omissions, and systematic failures are customs and policies of the City and the CPD caused individuals employed by the CPD, including the Defendant Officers, to use excessive and unreasonable force and to believe that complaints of excessive and unreasonable force would not be honestly or properly investigated, with the foreseeable result that such employees would therefore be likely to use excessive and unreasonable force.

### CPD Encourages, Maintains, and Condones a Code of Silence and Lack of Accountability

147.     The CPD also maintains a "code of silence" among officers that encourages, enables, and causes or contributes to misconduct, including the misconduct described in this complaint.

148.     The City has known about and encouraged this code of silence in the CPD at all times relevant to this complaint and has not taken action to address it.

149.     In 2007, a drunken off-duty CPD officer named Anthony Abbate brutally assaulted a female bartender who refused to continue serving him alcohol. When they realized the attack had been video-recorded, Abbate and his partner made numerous calls to each other and other CPD

---

[9] *See* Debra Witzburg & Tobara Richardson, Enforcement of the Chicago Police Department's Rules Requiring Officers to Report Misconduct, City of Chicago Office of Inspector General (Aug. 3, 2023), available at https://igchicago.org/wp-content/uploads/2023/08/Enforcement-of-CPDs-Rules-Requiring-Members-to-Report-Misconduct.pdf.

officers, including police detectives and other higher-ranking members of the CPD. According to a federal judge presiding over a civil lawsuit related to this incident, this supported an inference of a code of silence within the CPD. The judge also noted that responding officers omitted key information from their report of the incident, including the fact that Abbate was a police officer, and that the beating was captured on surveillance video. *Obrycka v. City of Chicago*, No. 07 C 2372, at 13-14 (N.D. Ill. Feb. 23, 2012).

150.    In 2012, in *Obrycka*, a federal jury found that the City had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence.

151.    In 2016, the City paid two CPD officers $2 million to settle their claim that they had been blackballed by the CPD for helping the FBI investigate corrupt CPD police officers. The officers alleged that they were labeled "rats" by their superiors, given less-desirable jobs, and informed that fellow CPD officers would not have their backs on the street. According to the Chicago Tribune, the City offered to admit to a code of silence within the CPD if they could prevent Mayor Emanuel from testifying in a deposition, but the judge ruled he would have to testify. Rather than face the prospect of the Mayor testifying to the CPD's code of silence, the City agreed to settle the case.[10]

152.    In April 2016, former Mayor Lori Lightfoot chaired the City's Police Accountability Task Force, and after investigation into the pervasive misconduct in Chicago policing, including the failure to enforce Rule 14, concluded:

---

[10] Chip Mitchell, *Chicago Mayor Rahm Emanuel's 'Code Of Silence' Speech Still Burdens City Attorneys*, WBEZ Chicago, Jan. 30, 2017, available at https://www.wbez.org/stories/chicago-mayor-rahm-emanuels-code-of-silencespeech-still-burdens-city-attorneys/67aecfdb-5241-45fa-bd3d-14bfc19a0a30; *see also* John Byrne, *$2M Settlement in Whistleblower Case that Allowed Mayor to Skip Testimony*, Chicago Trib. (Nov. 1, 2016), available at https://www.chicagotribune.com/politics/ct-emanuel-whistleblower-police-settlement-met-20161031-story.html.

[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City.[11]

153. The establishment of COPA has not meaningfully changed the enforcement of Rule 14.

154. The 2017 DOJ Report also observed that both the City and the CPD were aware of the code of silence within CPD:

a. "Mayor [Rahm Emanuel] has acknowledged that a 'code of silence' exists in the CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation." Ex. 3 at 75.

b. "[A]ttempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." *Id.* at 8.

155. One sergeant interviewed as part of the DOJ investigation stated that "if someone comes forward as a whistleblower in the Department, they are dead on the street." *Id.* at 75.

156. In January 2020, the City's Interim Police Superintendent Charlie Beck stated "of course" there is a code of silence in the CPD.[12]

157. In July 2022, in *Svec v. Chicago*, a jury rendered a more than $4 million jury verdict in favor of a whistleblowing CPD officer who, upon reporting fabrications by fellow officers, was retaliated against and reassigned in conformity with the code of silence.[13]

---

[11] *Recommendations for Reform: Restoring Trust Between the Chicago Police and the Communities They Serve*, Police Accountability Task Force, at 70 (Apr. 2016), available at https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf.

[12] A.D. Quig, *CPD's Beck: "Of course" There's a Code of Silence*, Crain's Chicago Business, Jan. 13, 2020, available at https://www.chicagobusiness.com/government/cpds-beck-course-theres-code-silence.

[13] Mary Norkol, *Jury Awards CPD Whistleblower More Than $4 Million in Suit Against City*, July 23, 2022, available at https://chicago.suntimes.com/city-hall/2022/7/23/23275529/chicago-police-whisteblower-lawsuit-svec-4-million-award.

158. In August 2023, the OIG found that the "CPD informs members of their duty to report misconduct during recruit training but does not formally reinforce this requirement through ongoing training or messaging" and that the "COPA and BIA do not consistently pursue violations of" misconduct reporting requirements which "inhibits any thorough analysis of failures to report—on the part of individual members or agency-wide."[14]

159. Furthermore, when significant discipline is rendered by COPA or BIA, it is subject to veto or alteration by exterior sources, like the Police Board or Superintendent of Police, contributing to the inadequate disciplinary mechanisms in place for CPD officers.

160. The CPD's code of silence, failure to train, and failure to discipline caused Defendant Officers' wrongful handling of Mr. Bradshaw's case in multiple ways, including but not limited to:

   a) Causing Defendant Officers' improper service of the EOP and unlawful detainment of Mr. Bradshaw in excess of the time required to serve him with the EOP;

   b) Causing Defendant Officers' unlawful detainment of Mr. Bradshaw on the unreasonable belief that he had violated the EOP before he had even been informed of its existence;

   c) Causing Defendant Officer MESCALL's use of his taser on Mr. Bradshaw, and lack of fear of rebuke or consequence for the same, despite the clear control that other Defendant Officers maintained over Mr. Bradshaw at the time of his use of force;

---

[14] Debroah Witzburg & Tobara Richardson, *Enforcement of the Chicago Police Department's Rules Requiring Members to Report Misconduct*, City of Chicago Office of Inspector General, at 4 (Aug. 3, 2023), available at https://igchicago.org/wp-content/uploads/2023/08/Enforcement-of-CPDs-Rules-Requiring-Members-to-Report-Misconduct.pdf.

d)  Causing Defendant Officers' failure to intervene to prevent Defendant Officer MESCALL's unlawful use of force; and

e)  Causing Defendant Officers' misrepresentations of the occurrences of September 26, 2022 subsequent to their actions in the field.

161.    The City and the CPD's custom and practices of failing to discipline or otherwise train officers, consistent pattern of using unreasonable force, and maintenance of a code of silence caused Plaintiff's constitutional injuries and were taken with deliberate indifference to their consequences to members of the public like Mr. Bradshaw.

*The City and CPD's Training and Supervision Failures Concerning Service and Enforcement of Orders of Protection*

162.    The City's widespread custom of failing to train and supervise CPD officers regarding the lawful procedures for the service and enforcement of orders of protection, such as the EOP, was the moving force behind Mr. Bradshaw's injuries, together with the other unlawful customs and practices identified herein.

163.    Defendant Officers unreasonably exceeded their authority under the EOP with respect to Mr. Bradshaw.

164.    The City has a duty to adequately train CPD officers to handle routine or recurring situations, such as serving EOPs on named respondents, which present obvious potential for violations of fundamental rights, unlawful deprivations of liberty, escalation of incidents of domestic violence, and other serious risk of harm to the parties, bystanders, or officers themselves.

165.    Since at least 2014, the CPD has created and published policy and procedure directives instructing its officers regarding service and enforcement of orders of protection, such as the EOP. *See* Orders of Protection - Policy, General Order G04-04-01; Orders of Protection - Procedures, Special Order S04-04-01.

166.    Both CPD directives explicitly describe, often in bold or double-underline, the distinction between court-enforced and police-enforced order of protection remedies in Cook County.

167.    The standardized Illinois EOP court form separates remedies into boxes. Next to each box, in bold, the form indicates whether the respective remedy is court-enforced, police enforced, or police/court-enforced.

168.    Box 10 of the EOP against Mr. Bradshaw is titled "Possession of Personal Property" and is labeled court-enforced.

169.    Box 10 of the EOP against Mr. Bradshaw listed "house keys" as personal property. In the blank space next to "the property shall be transferred at," the EOP reads "1910 W. Crystal, Chicago." In the blank space for "date," it states "TBD."

170.    None of the Defendant Officers reasonably or correctly interpreted their authority under the express terms of the EOP against Mr. Bradshaw on September 26, 2022.

171.    Defendant Officer MESCALL's decision to lunge at Mr. Bradshaw for the purpose of seizing his keys far exceeded any authority granted by the EOP and was a direct and proximate cause of the rapidly escalating uses of force on the part of all Defendant Officers, which seriously injured Mr. Bradshaw.

172.    As CPD officers were not empowered under the express terms of the EOP to seize Mr. Bradshaw's keys, Defendant Officer MESCALL's conduct demonstrates the City's unreasonable and unconstitutional failure to train and supervise employees cloaked with police powers.

173.    The CPD directives regarding orders of protection demonstrate the City's knowledge of the known and obvious consequences of officers purporting to serve or enforce

orders of protection in a manner inconsistent with the law and the due process rights of petitioners and respondents.

174.    The CPD and the City exhibit deliberate indifference to the known risks of improper and unlawful service and enforcement of orders of protection by failing to adequately train officers, which results in unwarranted infringements of the rights of citizens and privacy and liberty interests protected by the U.S. and Illinois Constitutions.

175.    The City's failure to adequately train its employees on the proper service and enforcement of orders of protection was the moving force behind Mr. Bradshaw's injuries. Indeed, not one, but *twelve*, CPD officers failed to follow CPD policy regarding service and enforcement of orders of protection in connection with the September 26, 2022 encounter with Mr. Bradshaw.

176.    The City failed to train and supervise Defendant Officers, including Defendant Officers MESCALL and GRANIAS, the commanding officers on the scene, who both unreasonably and erroneously exceeded their authority under the EOP.

177.    The Defendant Officers had ample opportunity to and many did, in fact, read the EOP on the scene on September 26, 2022.

178.    As noted above, the standardized Illinois court form plainly differentiates police- and court-enforced remedies; it is objectively unreasonable for CPD officers to interpret a court order to mean the opposite of what it expressly says.

179.    None of the Defendant Officers properly followed the EOP or abided by its express terms, despite reading it and re-reading it.

180.    The non-supervisor Defendant Officers each had many reasonable opportunities to inform their supervisors that they had departed from lawful procedures with regard to the service and enforcement of the EOP.

181.    It is obvious and easily predictable on the part of the City that CPD officers are likely to cause serious constitutional violations and personal injuries if, as they did here, they improperly seek to enforce orders that concern a person's right to occupancy of a home, whether they be forced to continue cohabitating with an abusive partner or family member, or whether they will be arrested, charged, and detained, without sufficient knowledge and notice of the authority purporting to order these life-altering changes.

182.    In addition to failing to follow the terms of the EOP which distinguished between police-enforced and court-enforced remedies, the Defendant Officers also failed to follow the established CPD procedure for effecting "Short Form" service of an EOP.

183.    Without exhaustively listing each provision or directive the CPD violated or ignored in this complaint, on information and belief, other consequences of the City's deliberately indifferent and inadequate training include: the Defendant Officers' failure to complete an Affidavit of Service, failure to send a copy of the Short Form or Affidavit of Service to the Cook County Sheriff LEADS unit, failure to update the LEADS system after their encounter with Mr. Bradshaw, failure to provide an Affidavit of Service to the court which issued the EOP, and other stark deviations from law and from the City's policies and procedures relevant to service and enforcement of orders of protection, such as the EOP.

184.    Mr. Bradshaw suffered serious physical and psychological injuries, economic harm, and deprivations of liberty as a direct result of the City's failure to train and supervise the Defendant Officers on service and enforcement of orders of protection.

185.    The City and CPD have generally failed to train and supervise their employee-officers on orders of protection, causing a host of adverse and injurious ramifications for the parties in order of protection proceedings.

186.    As happened here, the City and CPD failed to train and supervise their officers on properly transmitting proof of service of orders of protection to the issuing court in the Domestic Violence Division of the Circuit Court of Cook County.

187.    Without proof of service in the docket, judges in the Domestic Violence Division are unable to proceed to plenary hearings, enforcement by civil contempt, or other remedies that are often urgently necessary for bona fide victims of domestic violence.

188.    Final policymakers for the City and the CPD ignore or disregard the obviously foreseeable harms of their officers' notifying individuals who may, in fact, be guilty of crimes of domestic violence that the victim has obtained an EOP against them, *but then failing to prove service with the court*. This scenario places a domestic violence victim in a helpless situation where their abuser may be provoked by the existence of the EOP but nevertheless outside the bounds of enforcement due to the CPD's failure to properly effectuate and establish service.

189.    Conversely, in scenarios following the pattern of the September 26, 2022 incident described in this complaint, where unfounded orders of protection are entered on the basis of a complainant's false representations, the City's and the CPD's failure to train and supervise its officers to know and follow the letter of the law leads to foreseeable harm to innocent respondents, such as Mr. Bradshaw. Where an unfounded EOP is issued, lawful service and enforcement would ensure that the respondent's unavoidable loss or distress in such cases is, at minimum, not exacerbated by untrained police officers.

190.    Both scenarios are likely to be routine occurrences in Chicago and Cook County: actual victims of domestic violence obtain EOPs amid serious concerns for their safety and, conversely, abusive or mentally unwell individuals exploit the *ex parte* nature of the EOP process

to obtain unfounded orders against victims, rivals, or people with whom they may have some dispute that nevertheless does not constitute domestic violence.

191.     The City, the CPD, and Defendant Officers have a duty to refrain from violating the Constitutional rights of all the parties in any of these scenarios.

192.     The City has functionally decided to violate the Constitution through its widespread custom of failing to train and supervise its officers to ensure they follow the policies and procedures clearly designed to prevent known, foreseeable harms from improper and illegal service and enforcement of orders of protection, like the EOP in this case.

**COUNT I: 42 U.S.C. § 1983 – Unlawful Seizure – Extended "Service" Of The EOP**

193.     Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

194.     Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

195.     All of the individual Defendant Officers named in this complaint are employees of the CPD.

196.     The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

197.     As described more fully above, the Defendant Officers ignored or unreasonably misapplied the EOP's express instructions by attempting to illegally seize Mr. Bradshaw's house keys purportedly in furtherance of enforcement of the EOP. However, the EOP made clear that this remedy could only be enforced by the court, not by the Defendant Officers.

198.     Mr. Bradshaw made no attempt to re-enter the home in the Defendant Officers' presence during the encounter on September 26, 2022.

199.     The Defendant Officers had no reason to stay and detain Mr. Bradshaw beyond the discussion they had with him regarding the EOP, yet they jointly pursued the unauthorized act of confiscating Mr. Bradshaw's keys.

200.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

201.     As described more fully above, the Defendant Officers seized Mr. Bradshaw and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

202.     As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT II: 42 U.S.C. § 1983 – Unlawful Seizure – Defendant Officer MESCALL's Unauthorized Lunge for Mr. Bradshaw's Keys**

203.     Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

204.     Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

205.     All of the individual Defendant Officers named in this complaint are employees of the CPD.

206.     The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

207. As described more fully above, the Defendant Officers ignored or unreasonably misapplied the EOP's express instructions by attempting to illegally seize Mr. Bradshaw's house keys purportedly in furtherance of enforcement of the EOP. However, the EOP made clear that this remedy could only be enforced by the court, not by the Defendant Officers.

208. From the moment the Defendant Officers approached Mr. Bradshaw, his keys were visible and in his hands up through Defendant Officers' initiation of the use of force.

209. Sometime after reading Mr. Bradshaw a copy of the EOP, Defendant Officer MESCALL threw down his clipboard containing the EOP and forcibly grabbed Mr. Bradshaw's hand in an attempt to confiscate his house keys.

210. At least four other Defendant Officers joined or assisted in this effort by surrounding Mr. Bradshaw and working to restrain him in furtherance of the Defendant Officer MESCALL's unlawful attempt to seize Mr. Bradshaw's keys.

211. The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

212. As described more fully above, Defendant Officers seized Mr. Bradshaw and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

213. As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT III: 42 U.S.C. § 1983 – Excessive Force – Handcuffing, Taser Threat, and Use of Taser Against Mr. Bradshaw**

214.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

215.    Mr. Bradshaw's right to be free from unlawful seizure, including excessive force, is protected by the Fourth Amendment to the U.S. Constitution.

216.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

217.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

218.    As described more fully above, the Defendant Officers ignored or unreasonably misapplied the EOP's express instructions by attempting to illegally seize Mr. Bradshaw's house keys purportedly in furtherance of enforcement of the EOP. However, the EOP made clear that this remedy could only be enforced by the court, not by the Defendant Officers.

219.    After Mr. Bradshaw was restrained, Defendant Officer CASTANEDA handcuffed Mr. Bradshaw's right hand, while other Defendant Officers assisted in this seizure by forcibly grabbing Mr. Bradshaw's arms, shoulders, and torso, rendering him incapable of leaving.

220.    Despite the fact that Mr. Bradshaw was not free to leave and that Defendant Officer CORTEZ had successfully gained control over Mr. Bradshaw's keys, which the Defendant Officers would later improperly claim were a threat to their safety, approximately four other Defendant Officers continued their restraint of Mr. Bradshaw, shouting that they were trying to gain control of Mr. Bradshaw's house keys and remove them from Mr. Bradshaw's hand.

221.     Although Mr. Bradshaw was being held by several Defendant Officers and his keys were under their control, Defendant Officer MESCALL nevertheless shouted "taser" several times and then proceeded to deploy his taser on Mr. Bradshaw at least two times.

222.     The taser made contact with Mr. Bradshaw's chest and the force applied through the taser brought Mr. Bradshaw to his knees.

223.     The taser prongs were embedded within Mr. Bradshaw's chest and needed to be surgically removed.

224.     At the time of this use of force, Mr. Bradshaw was not fleeing or attempting to flee.

225.     At the time of this use of force, Mr. Bradshaw was not a threat to himself or others.

226.     At the time of this use of force, Mr. Bradshaw was not suspected of a serious crime.

227.     At the time of this use of force, Mr. Bradshaw was not actively resisting arrest.

228.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

229.     As described more fully above, the Defendant Officers seized Mr. Bradshaw, used excessive force, and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

230.     As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT IV: 42 U.S.C. § 1983 – Unlawful Seizure and Excessive Force– Continued Threat of Taser Against Mr. Bradshaw**

231.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

232.    Mr. Bradshaw's right to be free from unlawful seizure, including excessive force, is protected by the Fourth Amendment to the U.S. Constitution.

233.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

234.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

235.    After Mr. Bradshaw had been tasered, he remained on the ground and was not resisting or failing to comply with the Defendant Officers' orders.

236.    Despite Mr. Bradshaw being completely subdued at this time, Defendant Officer MESCALL proceeded to point and place the taser against the back of Mr. Bradshaw's neck and head region.

237.    At the time of this seizure and use of force, Mr. Bradshaw was not fleeing or attempting to flee.

238.    At the time of this seizure and use of force, Mr. Bradshaw was not a threat to himself or others.

239.    At the time of this seizure and use of force, Mr. Bradshaw was not suspected of a serious crime.

240.    At the time of this seizure and use of force, Mr. Bradshaw was not actively resisting arrest.

241.    As described more fully above, Defendant Officers seized Mr. Bradshaw, used excessive force, and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

242.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT V: 42 U.S.C. § 1983 – Unlawful Seizure – Mr. Bradshaw Is Unreasonably Restrained at the Hospital**

243.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

244.    Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

245.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

246.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

247.    After Mr. Bradshaw was tased, he was transported to a hospital, where he received medical treatment. The Defendant Officers accompanied Mr. Bradshaw to the hospital. Although they acknowledged that Mr. Bradshaw did not pose a threat to them or to hospital staff, they handcuffed Mr. Bradshaw, who was seriously injured, to his hospital bed, restraining his movement.

248.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

249.    As described more fully above, Defendant Officers seized Mr. Bradshaw and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

250.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

### COUNT VI: 42 U.S.C. § 1983 – Malicious Prosecution (*Thompson*)

251.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

252.    Mr. Bradshaw's right to be free from unlawful seizure, including malicious prosecution, is protected by the Fourth Amendment to the U.S. Constitution.

253.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

254.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

255.    The Defendant Officers caused Mr. Bradshaw to be prosecuted and unlawfully subjected to pre-trial detention in the absence of probable cause.

256.    Specifically, the Defendant Officers did not have probable cause to arrest and charge Mr. Bradshaw for violating an order of protection he had not been served with, had not violated, and that the Defendant Officers did not have authority to enforce.

257.    Specifically, the Defendant Officers lacked probable cause to arrest, charge, and cause the prosecution of Mr. Bradshaw for assault.

258.    Specifically, the Defendant Officers' actions, based upon these wrongful charges against Mr. Bradshaw, led to a lengthy seizure followed by a lengthy prosecution.

259.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

260.    As described more fully above, Defendant Officers seized Mr. Bradshaw and caused him to be unlawfully detained and maliciously prosecuted, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

261.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT VII: 42 U.S.C. § 1983 – Unlawful Detention – The GPS Monitoring and Continued Surveillance of Mr. Bradshaw**

262.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

263.    Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

264.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

265.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

266.    As described elsewhere herein, Mr. Bradshaw was subjected to electronic monitoring on the basis of a charge, violation of an order of protection, for which there was no probable cause.

267.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

268.    As described more fully above, Defendant Officers seized Mr. Bradshaw and caused him to be unlawfully detained, without probable cause or any lawful justification and on the basis of their unreasonable interpretation of the authority granted to them in the EOP in violation of the Fourth Amendment of the U.S. Constitution.

269.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

**COUNT VIII: 42 U.S.C. § 1983 –*Monell* Liability – Failure to Train, Failure to Eliminate the Code of Silence**

270.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

271.    Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

272.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

273.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

274.    The actions of the Defendant Officers resulted from policies, practices, customs, and usages of the City, including failing to adequately discipline CPD officers and failing to eliminate CPD's code of silence.

275.    The City has a duty to properly supervise its officers and agents, including disciplining and training officers to prevent constitutional violations, and an obligation to address its code of silence to prevent constitutional violations.

276.    Despite the City's actual and constructive notice of its systematic failings in terms of constitutional policing, the Defendant Officers' dozens of disciplinary complaints among other CPD officers' disciplinary complaints, and the code of silence rampant within the department, it failed to take any action to remedy these defects.

277.    The City's deliberate indifference to adequately training and disciplining officers and eliminating the code of silence caused the unlawful seizures, excessive force, and wrongful prosecution by the Defendant Officers.

278.    The failure to train and discipline officers and maintenance of a code of silence are customs, practices, policies, and usages that caused the Defendant Officers to violate Mr. Bradshaw's constitutional rights.

279.    The City has a duty to properly supervise its employees and agents. The City breached that duty by improperly training, authorizing, encouraging or directing officers to engage

in improper service and enforcement of orders of protection and impermissible seizures, without probable cause and without sufficient legal basis, and/or condoning such actions.

280.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

281.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

### COUNT IX: 42 U.S.C. § 1983 – Failure to Intervene

282.    Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

283.    Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

284.    All of the individual Defendant Officers named in this complaint are employees of the CPD.

285.    The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

286.    The Defendant Officers all were present and failed to intervene to stop the violations of Mr. Bradshaw's Fourth Amendment rights.

287.    The Defendant Officers all had a reasonable opportunity to intervene and prevent the unreasonable detentions of Mr. Bradshaw and unreasonable uses of force against him. Each of the Defendant Officers failed to take any action to stop the violations of Mr. Bradshaw's rights and the harm that was being caused to him.

288.     Specifically, and without limitation, Defendant Officers ALVISO and CORTEZ failed to inform Defendant Officer MESCALL that they had control of Mr. Bradshaw and had control of his keys before Defendant Officer MESCALL wrongfully deployed his taser, and after he shouted "taser" to the group of Defendant Officers and Mr. Bradshaw.

289.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Mr. Bradshaw.

290.     As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

## COUNT X: 745 ILCS 10/9-102 – Indemnification

291.     Mr. Bradshaw incorporates the allegations in all other paragraphs of this complaint as though fully set forth herein.

292.     Mr. Bradshaw's right to be free from unlawful seizure is protected by the Fourth Amendment to the U.S. Constitution.

293.     All of the individual Defendant Officers named in this complaint are employees of the CPD.

294.     The acts of the Defendant Officers alleged above were conducted under color of law and within the scope of the Defendant Officers' employment or duties.

295.     In Illinois, municipalities are obligated to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 745 ILCS 10/9-102.

296.    As such, the City is liable to Mr. Bradshaw for any award of compensatory damages and costs that arise from the actions of the Defendant Officers.

297.    The City is responsible for paying any judgment entered against the Defendant Officers. Mr. Bradshaw therefore demands judgment against the City in the amounts awarded to Mr. Bradshaw against the Defendant Officers as damages, attorneys' fees, costs, and interest.

298.    As a direct and proximate result of the misconduct by the Defendants, Mr. Bradshaw suffered damages, including loss of liberty, physical injury, emotional injury, loss of income, loss of job prospects, and other damages, in violation of his constitutional rights.

## PRAYER FOR RELIEF

As a result of these violations, Mr. Bradshaw requests that the Court grant the following relief against Defendants:

A.    Declare the conduct of Defendants to have violated the rights guaranteed to Mr. Bradshaw under the United States Constitution;

B.    Grant an order providing:

  i.    Judgment for compensatory damages against Defendants jointly and severally in an amount to be determined at trial.

  ii.    Judgment for punitive damages against all Defendants jointly and severally in an amount to be determined at trial.

  iii.    Judgment for nominal damages to vindicate the violation of Mr. Bradshaw's rights under the Constitution of the United States of America.

  iv.    Pre-judgment and post-judgment interest on any recovery as authorized by law.

v.   An award of the costs of this action against Defendants and reasonable attorneys' fees, in accordance with 42 U.S.C. §§ 1988, 12205 and 29 U.S.C. § 794.

vi.   Such other and further relief that the Court deems appropriate.

## JURY DEMAND

Mr. Bradshaw respectfully demands trial by jury for all triable matters.

Dated: September 26, 2024                    Respectfully submitted,

*s/ Skyler J. Silvertrust*
Skyler J. Silvertrust
Bianca L. Valdez
Chloe E. Holt
Willkie Farr & Gallagher LLP
300 North LaSalle
Chicago, Illinois 60654-3406
(312) 728-9000
Email: ssilvertrust@willkie.com
        bvaldez@willkie.com
        cholt@willkie.com

Daniel Massoglia
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
Email: daniel@first-defense.org

*Attorneys for Aaron McCullough-Bradshaw*