## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AARON MCCULLOUGH-BRADSHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24 C 9015 |
| v. | ) | |
| | ) | Judge Kness |
| CITY OF CHICAGO, SERGEANT KENNETH | ) | |
| MESCALL, STAR NUMBER 848, SERGEANT | ) | |
| GEORGE GRANIAS, STAR NUMBER 1731, | ) | |
| JULIO CASTANEDA, STAR NUMBER 17665, | ) | |
| ILIA ACEVEDO, STAR NUMBER 10955, | ) | |
| MARCO CALDERON, STAR NUMBER 14850, | ) | |
| JANET CORTEZ, STAR NUMBER 11573, ERIK | ) | |
| MEJIA, STAR NUMBER 14998, CHARLES | ) | |
| ALVISO, STAR NUMBER 15672, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS
### COUNT VIII OF THE PLAINTIFF'S COMPLAINT


# EXHIBIT A

### Case No. 22 CV 964, Transcript of Proceedings before the Honorable Steven C. Seeger on February 22, 2024

2030642_1

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 1 of 57 PageID #:1083
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 2 of 58 PageID #:310

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   GISELLE HIGUERA,                )
                                     )
 4                  Plaintiff,       )
                                     )   Case No. 22 CV 964
 5   -vs-                            )
                                     )   Chicago, Illinois
 6   CITY OF CHICAGO, et al.,        )   February 22, 2024
                                     )   9:14 a.m.
 7                  Defendants.      )

 8              TRANSCRIPT OF PROCEEDINGS - Status
          BEFORE THE HONORABLE STEVEN C. SEEGER
 9
     APPEARANCES:
10
     For the Plaintiff:       CHRISTOPHER SMITH TRIAL GROUP, LLC
11                            BY:  MR. CHRISTOPHER RUDOLF SMITH
                              53 West Jackson Boulevard
12                            Suite 856
                              Chicago, IL  60604
13
14   For Defendant City       THE SOTOS LAW FIRM, P.C.
     of Chicago:              BY:  MS. ALLISON LYNN ROMELFANGER
15                            141 West Jackson Boulevard
                              Suite 1240A
16                            Chicago, IL  606064
17
     For Defendants Evan      JOHNSON & BELL, LTD.
18   Solano and Sammy         BY:  MR. BRIAN PATRICK GAINER
     Encarnacion:             33 West Monroe Street
19                            Suite 2700
                              Chicago, IL  60603
20
21
22   Court Reporter:          AMY M. KLEYNHANS, CSR, RPR, CRR
                              Federal Official Court Reporter
23                            United States District Court
                              219 South Dearborn Street, Room 2318A
24                            Chicago, IL  60604
                              Telephone:  (312) 818-6531
25                            amyofficialtranscripts@gmail.com
```

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 2 of 57 PageID #:1084
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 3 of 58 PageID #:311

2

1       (Proceedings heard in open court:)

2           THE CLERK:   22 CV 964, Higuera versus City of

3  Chicago, *et al.*

4           THE COURT:   Good morning, folks.   Good morning,

5  everybody.   Good morning.

6           MR. SMITH:   Good morning.

7           THE COURT:   Let's get everyone's appearances on the

8  record, if you would, please.   Start with counsel for the

9  plaintiff.

10           MR. SMITH:   Christopher Smith on behalf of the

11  plaintiff.

12           THE COURT:   Good morning.

13           MR. GAINER:   Good morning, Your Honor.

14           Brian Gainer on behalf of Defendant Solano and

15  Encarnacion.

16           THE COURT:   All right.   Good morning.

17           MS. ROMELFANGER:   Good morning, Your Honor.

18           Allison Romelfanger on behalf of the City of Chicago.

19           THE COURT:   All right.   Very good.

20           Good morning, folks.   Thank you for coming in.   It's

21  like the good ole days back in the Dirksen Federal Building.

22  We actually used to show up at the federal courthouse and see

23  a judge, which doesn't happen as much as it used to.   I am

24  somewhat mourning the loss of the culture here in the building

25  where we used to get together.   I think there were a lot of

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 3 of 57 PageID #:1085
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 4 of 58 PageID #:312

3

1    benefits both for the bench and the bar to get together and

2    talk things over.  I think it created a lot of collegiality

3    amongst the bar, and people got to know each other and got to

4    know the judges, and judges got to know the lawyers.

5         And I remember back in the day when the courtroom

6    would be filled.  Do you remember those days?  The courtroom

7    would be filled and you'd talk to people.

8         MR. GAINER:  We were just talking about that actually

9    before you came in.

10        THE COURT:  I think there was a cultural loss,

11   actually, to that.

12        So it's nice to see you.  Thank you for coming in.

13        I called you in today because I'm going to give you

14   an oral ruling on the motions to dismiss.

15        MR. GAINER:  Okay.

16        THE COURT:  Let me say this at the outset.  I know

17   that you would prefer a written ruling.  If I were you, I

18   would prefer a written ruling.  I would.

19        But here's the simple reality:  I've got -- I don't

20   know -- between 3 and 400 cases.  I've got hundreds of pending

21   motions.  I cannot write on every motion that's in front of

22   me.

23        It is just faster to write down on a piece of paper

24   what I want to say and then read it, because the proofing

25   process to go from something on my pad of paper to something

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 4 of 57 PageID #:1086
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 5 of 58 PageID #:313

4

1  that I want on Westlaw is more than you might think.  It has

2  to have a little bit more spit polish to do that.

3       I am on one of the national committees, and I was

4  talking recently to one of the judges from the SDNY who was

5  saying that it's his practice to routinely do oral rulings,

6  and he really encourages people to do that.  So I'm trying to

7  do it I think from time to time when I can in an appropriate

8  case.

9       I know that you may want to be able to read for

10  yourself or for your client or for the record down the road.

11  And that makes perfect sense.  You can order the transcript if

12  you'd like.  The transcript will be the record.

13       Let me say this as well:  I have citations to

14  basically everything that I'm going to say, especially

15  citations to the complaint.

16       If I go ahead and read each of those citations, this

17  is going to be impenetrable.  So, especially when I get to the

18  facts, please understand that I've got citations for

19  everything.  If there is any particular sentence that you

20  think is unlikely would have had a citation and you want to

21  ask me later "what were you citing," you can do it.  But I'm

22  not reinventing the wheel here; I'm just going to be

23  summarizing the allegations of the complaint.

24       So if you'd like, you can take a seat.  You might be

25  more comfortable.  I'll just read to you what my ruling is

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 5 of 57 PageID #:1087
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 6 of 58 PageID #:314

5

1    going to be.

2         I remember doing this with Judge Shadur, by the way.

3    I used to come in for Judge Shadur, and he would hold court

4    and have me take a seat and he would read longwinded rulings

5    which were undoubtedly more penetrating than what I'm about·to

6    do given it was Judge Shadur.

7         But you're welcome to have a seat, and I'll just go

8    ahead and give you my oral ruling.  Okay?

9         MS. ROMELFANGER:  Thank you, Judge.

10        MR. SMITH:  Thank you, Judge.

11        MR. GAINER:  Thank you.

12        THE COURT:  All right.  Thank you, folks.

13        So, again, I'm going to be reading my oral ruling on

14   the motions to dismiss.  Thank you for indulging me with the

15   fact that there is an oral ruling.

16        Here it goes.

17        This case stems from a March 2021 fatal shooting by

18   an officer from the Chicago Police Department.  Officer Evan

19   Solano fatally shot Anthony Alvarez in the back after a foot

20   pursuit.  In the aftermath, Alvarez's estate sued Officer

21   Solano and his partner, Officer Encarnacion.  Both officers

22   were involved in the foot pursuit, and the estate also sued

23   the City of Chicago.

24        The estate later -- excuse me.  Let me say it again.

25        The estate brought a mix of Fourth Amendment claims

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 6 of 57 PageID #:1088
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 7 of 58 PageID #:315

6

1    and state law claims. The defendant officers moved to dismiss

2    the Fourth Amendment claims. This Court granted the motion in

3    part and denied the motion in part in November of 2022.

4          Later, the estate filed an amended complaint, and

5    then filed a second amended complaint. The second amended

6    complaint is the operative pleading. The second amended

7    complaint set off a second round of motions to dismiss. The

8    defendant officers filed one motion, and the City filed

9    another.

10         For the following reasons, the Court grants in part

11    and denies in part the two motions to dismiss.

12         I'll now turn to the background of the case. Again,

13    I will summarize the allegations of the second amended

14    complaint. I have cites to the second amended complaint for

15    each of the sentences that I'm about to read, but for the sake

16    of speed and readability, I'm not going to read each of the

17    cites into the record.

18         Here it goes.

19         Anthony Alvarez walked through Chicago's Portage Park

20    neighborhood near midnight on March 31st, 2021.

21         Chicago Police Department Officers Evan Solano and

22    Sammy Encarnacion spotted Alvarez from their unmarked SUV.

23         They recognized Alvarez. The night before, the two

24    officers had "followed" him in their vehicle.

25         I'm citing there Paragraph 11.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 7 of 57 PageID #:1089
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 8 of 58 PageID #:316

7

1           The complaint does not explain why he was followed.

2           Let me turn back to the night in question,

3      March 31st, 2021.  The officers saw Alvarez.  "There were no

4      warrants" out for his arrest, and there weren't any

5      "investigative alerts to notify officers to stop or speak" to

6      him.  I'm quoting Paragraph 14.

7           Alvarez didn't have any criminal convictions, either.

8      But according to the second amended complaint, the officers

9      "agreed to go after him."  I'm quoting Paragraph 13.

10          The officers "did not activate their body-worn

11     cameras."  But they hit the gas and "drove their vehicle

12     straight at" Alvarez.  I'm quoting Paragraphs 17 and 21.

13     Alvarez started running to "avoid being struck."  I'm quoting

14     Paragraphs 18 to 19.

15          At some point, the officers jumped out of their car.

16     Again, the second amended complaint alleges that they "did not

17     activate their body-worn cameras."  I'm quoting Paragraph 25.

18          A foot chase ensued.

19          Officer Encarnacion exited the car first and started

20     chasing Alvarez.  Officer Solano then trailed behind.

21          Officer Solano did not bring up the rear for long.

22     He overtook Officer Encarnacion.

23          Once leading the charge, Officer Solano ran down the

24     alley and turned onto the 5200 block of West Eddy Street.  He

25     spotted Alvarez who had lost his footing.  According to the

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 8 of 57 PageID #:1090
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 9 of 58 PageID #:317

8

1   second amended complaint, Officer Solano "immediately fired

2   several shots." I'm quoting Paragraph 32. The bullets struck

3   Alvarez in his back and in his leg. He died from the wounds.

4           Giselle Higuera is the administrator of Alvarez's

5   estate. She filed this lawsuit. She named Officer Solano,

6   Officer Encarnacion, and the City of Chicago as defendants.

7           Some of the complaint's claims invoked Section 1983.

8   The estate alleged that both officers violated the Fourth

9   Amendment when they used excessive force. The estate also

10  alleged that the officers violated the Fourth Amendment when

11  they failed to intervene in each other's conduct.

12          The estate also brought a Fourth Amendment *Monell*

13  claim against the City of Chicago. The estate offered two

14  theories. First, the estate alleged that the City's

15  "problematic history of deadly foot chases and related

16  excessive force" caused the underlying constitutional

17  violations.

18          The complaint referenced a 2017 report from the U.S.

19  Department of Justice. According to the complaint, the

20  Department of Justice "found that the CPD's pattern and

21  practice of unreasonable force included shooting at fleeing

22  suspects who presented no immediate threat."

23          The complaint continued. It noted that the Illinois

24  Attorney General filed a federal lawsuit against the City of

25  Chicago in 2017. That lawsuit culminated in a 2019 consent

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 9 of 57 PageID #:1091
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 10 of 58 PageID #:318

9

1    decree.   Under the decree, an independent monitor provides

2    periodic updates to the -- excuse me -- periodic updates on

3    the department's progress.

4              You can see the consent decree in Case No. 17 CV

5    6260.   It's referred to in the complaint at Paragraph 39,

6    meaning the complaint in front of me, 22 CV 964.

7              According to the complaint in the case in front of

8    me, the independent monitor's third report covered the

9    March 1, 2020, to December 31st, 2020, period.   That period is

10   not much after Officer Solano killed Alvarez in March 2021.

11   The report revealed that the "percentage of foot pursuits

12   ending in some level of force . . . increased by 6.1 percent"

13   compared to an earlier reporting period.   I'm quoting there

14   Paragraph 40.

15             As the complaint puts it, the report reflected that

16   the City "failed to reach full compliance in developing a

17   supplemental foot training bulletin that reflects best

18   practices from foot pursuit policies in other jurisdictions."

19   I'm quoting there Paragraph 40.

20             In sum, the complaint alleged that the Chicago Police

21   Department "did not have a foot pursuit policy and/or the

22   training necessary to implement an appropriate policy" when

23   Officer Solano killed Alvarez.   I'm quoting Paragraph 41.

24             The estate's second *Monell* theory shifted focus away

25   from the department's missing foot pursuit policy.   The

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 10 of 57 PageID #:1092
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 11 of 58 PageID #:319

10

1    estate's second theory alleged that the City's "failure to

2    supervise and discipline has led to a police culture of

3    impunity." I'm quoting there Paragraphs 46 to 68. That's the

4    section that talks about the second theory.

5          Once again, the estate referred to the Department of

6    Justice's 2017 report. According to the complaint, the report

7    found that the City had "systemic deficiencies" including the

8    "failure to review and investigate officer use of force." I'm

9    quoting there Paragraph 54.

10         The failure "helped create a culture in which

11    officers expect to use force and not be questioned about the

12    need for or propriety of that use." I'm quoting there

13    Paragraph 54.

14         In other words, the complaint described an "endemic

15    attitude" among CPD officers that "they may engage in

16    excessive force against the citizenry with impunity and

17    without fear of official consequence." I'm quoting there

18    Paragraph 59.

19         The estate also brought a variety of state law claims

20    above and beyond the Fourth Amendment claims.

21         The Court will discuss those claims down the road.

22         In response, the defendant officers filed a motion to

23    dismiss. They challenged the Fourth Amendment claims.

24         This Court issued a decision in writing on that

25    motion to dismiss on November 30th, 2022. The Court granted

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 11 of 57 PageID #:1093
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 12 of 58 PageID #:320

11

1    the motion in part and denied the motion in part.  It's in the

2    docket at Docket No. 61.

3          First, the Court dismissed the estate's Fourth

4    Amendment excessive force claims against the officer

5    defendants to the extent that the claims relied on the foot

6    chase and the vehicle pursuit.

7          The Court explained that a Fourth Amendment excessive

8    force claim requires a seizure.  That's what the text of the

9    Fourth Amendment says, after all.  And a "seizure requires

10   physical contact, or submission to a lawful command to stop."

11   I'm quoting Page 2 of my order, Docket No. 61.  The order is

12   dated, again, November 30th, 2022.

13         But the original complaint did not allege that the

14   officers' vehicle made "physical contact" with Alvarez.  And

15   the complaint did not allege that Alvarez submitted to the

16   officers' authority during the chase.  So the estate didn't

17   allege that the officers seized Alvarez during the run or

18   during the drive-up to him in the vehicle.

19         It actually happened chronologically different.  So

20   let me say that the other way.

21         The estate didn't allege that the officers seized

22   Alvarez when the vehicle approached him, and the estate also

23   didn't allege that the officers seized Alvarez when they ran

24   after him.  Approaching him in a vehicle isn't a seizure, and

25   running after somebody isn't a seizure if they don't submit to

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 12 of 57 PageID #:1094
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 13 of 58 PageID #:321

12

1     your authority.

2            On the other hand, the complaint did allege an

3     excessive force claim against Officer Solano based on another

4     theory.  Officer Solano seized Alvarez when the bullets

5     pierced him.  That's a physical contact.

6            The shooting theory did not hold up against Officer

7     Encarnacion.  After all, the complaint didn't allege that

8     Officer Encarnacion fired his weapon.  So, the Court dismissed

9     the Fourth Amendment excessive force claim against Defendant

10    Encarnacion altogether.

11           Then the Court turned to the Fourth Amendment failure

12    to intervene claims.  The Court held that the complaint

13    plausibly alleged a claim against Officer Encarnacion, but the

14    complaint dismissed the failure to intervene claim against

15    Officer Solano, meaning the officer who fired the weapon.  The

16    complaint did not allege that Officer Encarnacion violated the

17    Constitution except by failing to intervene.

18           So the complaint didn't allege that Officer Solano

19    violated his duty to intervene and stop an unconstitutional

20    act by Officer Encarnacion.  If the complaint didn't allege

21    that Officer Encarnacion violated the Constitution, then the

22    complaint couldn't allege that Officer Solano failed to

23    intervene to prevent a constitutional violation by Officer

24    Encarnacion.  In other words, there was no constitutional

25    violation to prevent.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 13 of 57 PageID #:1095
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 14 of 58 PageID #:322

13

1        You cannot fail to intervene to prevent a

2  constitutional violation when there was no constitutional

3  violation. That's the concept.

4        So, the lay of the land was as follows. After the

5  original motion to dismiss, the original complaint, this Court

6  concluded that the complaint stated an excessive force claim

7  against Officer Solano based on the shooting. The complaint

8  also stated a failure to intervene claim against Officer

9  Encarnacion based on his alleged failure to prevent the

10  shooting, but the Court dismissed all other excessive force

11  theories.

12        Since then, the estate filed a second amended

13  complaint. As an aside, the estate labeled the document as

14  the first amended complaint, but by the look of things, it

15  looks like it's the second amended complaint. So I'll be

16  referring to that as the second amended complaint because

17  that's what it looks to be despite what the caption may say.

18  I think you all know which one I'm referring to. It's Docket

19  No. 80. The sealed version is Docket No. 81.

20        The second amended complaint is similar to the

21  original complaint in many respects. It's not identical, but

22  it is similar. Just like the original filing, the complaint

23  invokes Section 1983. It also brings a *Monell* claim against

24  the City. The *Monell* theories are the same as the first time

25  around. The second amended complaint alleges that the City

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 14 of 57 PageID #:1096
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 15 of 58 PageID #:323

14

1  doesn't have a foot chase policy that is sufficient and that

2  the City fails to discipline its officers.

3       The second amended complaint included a few new

4  factual allegations.  I'll start with the factual allegations

5  that involve the policies and practices of the City.

6       According to the second amended complaint, Officer

7  Encarnacion gave an interview after the shooting.  Again,

8  Officer Encarnacion isn't the shooter.  Officer Encarnacion is

9  the shooter's partner.  The shooter is Officer Solano.

10      According to the second amended complaint, Officer

11 Encarnacion described the lack of training during that

12 interview.  The second amended complaint alleges that, after

13 the shooting, Officer Encarnacion "stated that he has not

14 received any real foot pursuit training, and that he regarded

15 the CPD training bulletin to constitute suggestions and

16 recommendations."  I'm quoting there Paragraph 46.

17      And Officer Solano "claimed that his review of the

18 training bulletin regarding foot chase policy caused him to

19 deviate from what he thought was the safest course of action."

20 I'm quoting Paragraph 43.

21      In other words, the complaint alleged that both

22 officers "claimed that they received no meaningful training as

23 to how to conduct a foot chase."  I'm quoting there

24 Paragraph 39.

25      The complaint added a few new facts to bolster its

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 15 of 57 PageID #:1097
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 16 of 58 PageID #:324

15

1  failure to discipline theory as well.

2       According to the complaint, the "Defendant Officers

3  believed that they could stop individuals and/or conduct

4  interviews without reporting or documenting it as a police

5  action, double hyphen, no body camera and no reporting."

6       I added the word "and" there for readability in

7  brackets.  I'm quoting there Paragraph 53 of the complaint.

8       The second amended complaint continues.  "After

9  killing Anthony Alvarez, neither Officer Solano nor

10 Encarnacion were required to describe the shooting, the number

11 of shots fired, nor whether there were any bystanders or

12 witnesses.  CPD is so busy making sure its officers are

13 protected from consequences in a shooting, that they do not

14 even ask questions related to immediate public

15 safety" -- excuse me -- "related to immediate public and

16 police safety."  I'm quoting Paragraph 76.

17      I'll now describe a few new factual allegations

18 against the two officers.  The complaint renewed the Fourth

19 Amendment excessive force and failure to intervene claims

20 against both defendant officers.  Take a look at

21 Paragraphs 132 to 137.

22      The factual allegations supporting those claims are

23 largely the same, but two new facts emerged.  The new facts

24 are about whether Officer Encarnacion had bullets and fired

25 his gun.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 16 of 57 PageID #:1098
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 17 of 58 PageID #:325

16

1        "According to the publicly released investigation

2   file," Officer Encarnacion "told his supervisor" that he

3   "fired his gun."  *Id.* at Paragraph 28.  A later inspection of

4   Officer Encarnacion's firearm revealed that one bullet was

5   "unaccounted for" after the shooting.  *Id.* at Paragraph 28 and

6   29.

7        The state law claims appeared in the second amended

8   complaint, too.  Some of the state law claims are against the

9   defendant officers.  Others are against the City, including a

10  wrongful death and a survival claim.

11       The second amended complaint set off a second round

12  of motions to dismiss.  The officer defendants filed a renewed

13  motion to dismiss, and the City did, too.

14       So I'll now turn to the motions at hand.

15       That's a basic overview of the facts of the case as

16  alleged in the second amended complaint.

17       I'll start with the standard for the motions to

18  dismiss.  You all know the standard for the motions -- for

19  motions to dismiss like the back of your hand.  Let me just

20  give you a quick summary.  I'm going to spare you a reading of

21  the citations to the case law.

22       A motion to dismiss under 12(b)(6) challenges the

23  sufficiency of the complaint, not its merits.  When

24  considering a Rule 12(b)(6) motion to dismiss, the Court

25  accepts as true all well-pleaded facts in the complaint and

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 17 of 57 PageID #:1099
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 18 of 58 PageID #:326

17

1     draws all reasonable inferences from those facts in the

2     plaintiff's favor.

3          To survive a Rule 12(b)(6) motion, the complaint must

4     provide the defendant with fair notice of the basis for the

5     claim, and it must be facially plausible.  A claim has facial

6     plausibility when the plaintiff pleads factual content that

7     allows the Court to draw the reasonable inference that the

8     defendant is liable for the conduct alleged.

9          So that's a summary of the allegations of the facts

10    in the second amended complaint, and it's a summary of the

11    legal standard.

12         I will now turn to my analysis of the claims.  I'm

13    going to start with the claims against the defendant officers.

14    I'll then tackle the claims against the City.

15         I'll start with the excessive force claims against

16    the two officers.

17         The officer defendants argue that the estate's second

18    amended complaint suffers from the same flaws as the earlier

19    complaint.  In other words, the defendant officers think that

20    the estate's second amended complaint tries to hook them with

21    theories this Court had already cut loose.

22         The defendant officers have a point.

23         I'm first going to address the claim about the

24    approach by the vehicle and the foot pursuit.

25         The second amended complaint echoes a theory that

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 18 of 57 PageID #:1100
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 19 of 58 PageID #:327

18

1    this court already dismissed.  The second amended complaint

2    alleges an excessive force claim against both officers based

3    on the "aggressive stop/foot pursuit."  I'm quoting

4    Paragraph 133 of the second amended complaint.

5            The estate does not point to any new facts that would

6    support a different outcome.  Instead, the estate simply

7    argues that this Court got things wrong the first time around.

8            An amended complaint is not a chance for a plaintiff

9    to serve up the same facts and same claims and same theories

10   in the hopes that the Court will dish out a different result.

11   An amended complaint is an opportunity to patch holes that

12   sunk the original complaint.

13           Here, the estate did not plug any holes.  The estate

14   has not come forward with any new facts that would change this

15   Court's conclusion.

16           For example, the estate does not allege that the

17   vehicle struck Alvarez.  The estate does not allege that the

18   officers touched or otherwise seized Alvarez during the foot

19   pursuit except when the firearm was fired.  The estate does

20   not allege that Alvarez submitted to the authority of the

21   officers during the foot pursuit.  Actually, it alleges the

22   opposite, that he didn't.  He was running.

23           The estate also does not cite any new case law.  If

24   there was new case law from the Seventh Circuit, I would

25   obviously consider it closely.  If there was new case law from

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 19 of 57 PageID #:1101
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 20 of 58 PageID #:328

19

1    another judge in this district, I would consider it closely.

2    I don't see any new facts, I don't see any new law, so I don't

3    see any reason to change my conclusion.

4            Maybe the estate thought that it needed to raise the

5    same claims a second time to preserve them.  If so, I don't

6    fault you for doing that.  I didn't like waiving things as a

7    lawyer, and maybe they did that out of a sense of

8    self-preservation.  If so, that's perfectly fine.  I don't

9    fault you.  But I'm just going to reach the same conclusion

10   that I already reached.  I dismissed the claims before and I'm

11   going to dismiss the claims again.

12           The excessive force claims are dismissed against the

13   officers to the extent that the estate is claiming Fourth

14   Amendment excessive force claims against the officers based on

15   the approach of the vehicle and based on the foot chase.

16           The approach of the vehicle is not a seizure, the

17   foot race is not a seizure for the reasons that I've already

18   explained in my last ruling and again today.  There was no

19   seizure, so there was no Fourth Amendment violation, so

20   there's no claim.

21           So, again, I am dismissing the Fourth Amendment

22   claims against the officers to the extent that they involve

23   the approach of the vehicle and to the extent that they

24   involve the foot pursuit.

25           This portion of the ruling does not cover the

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 20 of 57 PageID #:1102
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 21 of 58 PageID #:329

20

1    excessive force claim about the shooting itself, meaning the

2    penetration of the bullet into the person's body.

3            Next, I'm going to turn to the excessive force about

4    the shooting itself.

5            The estate frankly doesn't have much work to do to

6    keep the claim alive against Officer Solano.  The claim isn't

7    going anywhere.  The Court sees no reason to revisit its

8    earlier ruling.

9            The bottom line is that the complaint alleges that

10   the officer in question, Officer Solano, acted with excessive

11   force when he shot Alvarez.  That's enough to state an

12   excessive force claim in broad strokes.

13           So once again, I'm going to conclude that the estate

14   does state an excessive force claim against Officer Solano for

15   the shooting.  That's enough to survive a motion to dismiss.

16           The estate also attempts to revive the claim against

17   Officer Encarnacion.  The estate appears to want to revive its

18   theory based on the new allegations in the second amended

19   complaint.

20           In other words, the second amended complaint adds new

21   facts, a couple new facts, and based on those new facts, the

22   second amended complaint wants to bring an excessive force

23   claim against Officer Encarnacion himself.

24           Here are the new facts.

25           The first new fact is that Officer Encarnacion told

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 21 of 57 PageID #:1103
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 22 of 58 PageID #:330

21

1    his supervisor that he fired his gun.  That's at Paragraph 28

2    of the second amended complaint.  The second fact is that the

3    magazine in Officer Encarnacion's gun was missing one bullet

4    after the shooting.  That's Paragraph 29.

5         Here's the rub.  The second amended complaint does

6    not allege that Officer Encarnacion shot at Alvarez.  The

7    second amended complaint doesn't allege that one of Officer

8    Encarnacion's bullets hit Alvarez.  The gap matters.

9         A Fourth Amendment seizure can take "the form of

10   physical force or a show of authority that in some way

11   restrains the liberty of the person."  See *Hess v. Garcia*, 72

12   F.4th 753 at 763, Seventh Circuit 2023.

13        Physical force can be a seizure, but the complaint

14   does not allege that Officer Encarnacion used physical force

15   against Alvarez.

16        Let me say that again.

17        The second amended complaint does not allege that

18   Officer Encarnacion used physical force against Alvarez.  The

19   second amended complaint does not allege that Officer

20   Encarnacion fired a bullet that hit Alvarez.  The second

21   amended complaint does not allege that Officer Encarnacion

22   applied physical force to Alvarez's body.

23        The other option for a seizure under the Fourth

24   Amendment is submission to a show of authority.  But the

25   complaint doesn't allege that Alvarez submitted to authority.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 22 of 57 PageID #:1104
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 23 of 58 PageID #:331

22

1    Instead, it alleges the opposite.  It alleges there was a foot

2    chase.

3            The complaint alleges that Alvarez kept running until

4    Officer Solano shot him.  In other words, Alvarez never

5    voluntarily submitted to Officer Encarnacion's show of

6    authority because he was running away.  He kept going until

7    Officer Solano stopped him.

8            In sum, the complaint once again does not allege that

9    Officer Encarnacion seized Alvarez.  So the complaint doesn't

10   state an excessive force claim against Officer Encarnacion.

11           Let me put this part of the ruling for you in plain

12   English.

13           The second amended complaint says that Officer

14   Encarnacion fired his weapon.  It also alleges that he was

15   missing a bullet, or at least that's how you could read

16   Paragraphs 28 and 29.  That's something, but it's not enough

17   to get you there.

18           It doesn't allege that the gun was fired by Officer

19   Encarnacion at Alvarez.  In other words, I don't think it

20   alleges that Officer Encarnacion pulled out his weapon and

21   fired a shot at Alvarez.  It doesn't allege that a bullet from

22   Officer Encarnacion's gun hit Alvarez.  The second amended

23   complaint doesn't allege that Officer Encarnacion fired a shot

24   at Alvarez and missed but Alvarez was so concerned by that

25   that he submitted to the officer's authority and stopped in

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 23 of 57 PageID #:1105
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 24 of 58 PageID #:332

23

1    his tracks.  None of that is in there.

2          It simply alleges that a gun was fired at some point

3    in time and that a bullet is missing.  It doesn't say when the

4    gun was fired.  It doesn't say when the bullet went missing.

5          If the estate wants to allege that Officer

6    Encarnacion shot Alvarez, then it can do so, but it doesn't.

7          Let me clarify what I just said.

8          I said that they can allege that if they want, but

9    what I really meant is you can allege that if you think it is

10    actually true within the spirit of Rule 11, obviously.  That

11    goes without saying.  And don't take that the wrong way.

12    Don't take that the wrong way.

13          After watching the videos, I have some level of

14    concern about any allegation that Officer Encarnacion shot at

15    Alvarez.  But you know the case better than I do, and it's up

16    to you to plead the complaint.  It's not up to me to plead it.

17    Maybe there is something out there that I'm missing.  Maybe

18    the video doesn't show the whole thing.  I don't know.

19          But all I know is what I see in the second amended

20    complaint.  That's what I've got.  And I've got a complaint

21    here that alleges that there was a missing bullet.  And there

22    is a complaint here that he fired the gun at some point.

23    That's not enough to allege a seizure.  You'd have to either

24    show a physical force or a submission of authority.  Neither

25    one is alleged here.  So, I'm going to once again conclude

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 24 of 57 PageID #:1106
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 25 of 58 PageID #:333

24

1    that Officer Encarnacion does not have to face the excessive

2    force claim.

3          It's a long way of saying this:  As currently

4    alleged, the second amended complaint does not state an

5    excessive force claim against Officer Encarnacion because it

6    does not allege an act of physical force against Alvarez and

7    does not allege that he applied authority that restrained the

8    liberty of Alvarez.  That's the ruling.

9          I'm now going to turn to the Fourth Amendment claim

10   about failure to intervene against the officers.

11         To state a failure to intervene claim, a plaintiff

12   must plausibly allege that a defendant "(1) knew that a

13   constitutional violation was committed; and (2) had a

14   realistic opportunity to prevent it."  See *Gill v. City of*

15   *Milwaukee*, 850 F.3d 335, 342, Seventh Circuit 2017.

16         I'm going to start with Officer Solano.  Again, he is

17   the officer who shot Alvarez.

18         During the first motion to dismiss stage of the case,

19   this Court dismissed the failure to intervene claim against

20   Officer Solano.  The Court explained that the original

21   complaint didn't allege that Officer Encarnacion committed a

22   constitutional violation.  The only exception obviously was

23   the allegation that Officer Encarnacion failed to intervene in

24   the alleged violation by Officer Solano when he fired his

25   weapon.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 25 of 57 PageID #:1107
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 26 of 58 PageID #:334

25

1          Put that aside.

2          The fact that Officer Encarnacion did not commit a

3    freestanding constitutional violation doomed the failure to

4    intervene claim against Officer Solano.  There is no failure

5    to intervene claim against Officer Solano when there is no

6    underlying constitutional violation by Officer Encarnacion.

7          An officer cannot be liable for failing to intervene

8    in a constitutional violation by another officer when there is

9    no constitutional violation by the other officer.

10          Things haven't changed.  The second amended complaint

11   does not allege an excessive force claim against Officer

12   Encarnacion.  So, the second amended complaint does not

13   plausibly allege that Officer Solano violated any duty to

14   intervene.

15          Let me put that a little bit differently.

16          The second amended complaint does not allege that

17   Officer Solano failed to intervene to prevent a violation by

18   Officer Encarnacion because the complaint doesn't allege a

19   violation by Officer Encarnacion.  If there is no excessive

20   force claim against Officer Encarnacion, then, by definition,

21   there is no failure to intervene claim against Officer Solano

22   to prevent an excessive force claim -- excuse me -- violation

23   by Officer -- I'm going to say that again.

24          If there is no excessive force claim against Officer

25   Encarnacion, then, by definition, there is no failure to

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 26 of 57 PageID #:1108
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 27 of 58 PageID #:335

26

1    intervene claim against Officer Solano to prevent an excessive

2    force violation by Officer Encarnacion.

3       I hope I got the names straight there that second

4    time around.  I think you know what I mean.

5       If one officer didn't commit a constitutional

6    violation, then the other officer could not be liable under a

7    failure to intervene theory for a failure to prevent the

8    constitutional violation.  If there is no constitutional

9    violation, then there is no claim for failing to prevent a

10    constitutional violation.  There is nothing to prevent.

11    That's the concept.  There is nothing to prevent.

12       So, once again the Court dismisses the failure to

13    intervene claim against Officer Solano because there is no

14    underlying violation by Officer Encarnacion.

15       I'm now going to turn to the failure to intervene

16    claim against Officer Encarnacion.

17       In its previous order, the Court let the claim

18    against Officer Encarnacion go forward.  The Court explained

19    that the critical question was whether Officer Encarnacion had

20    a realistic opportunity to intervene.  The Court concluded

21    that question was best answered during discovery.

22       Officer Encarnacion thinks that the question can be

23    answered right here, right now.  According to Officer

24    Encarnacion, the factual landscape has changed since the first

25    motion to dismiss.  As he sees things, the now-publicly

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 27 of 57 PageID #:1109
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 28 of 58 PageID #:336

27

1   available body-cam footage resolves the issue, so there is no

2   need to go down discovery lane.

3         This court watched the body-cam footage. I watched

4   the footage from both cameras. The cameras captured footage

5   taken by each officer during and after the foot chase. The

6   footage shows the two officers chasing Alvarez. It shows a

7   heat-of-the-moment, fast-developing, heart-pounding foot

8   chase.

9         The footage shows the two officers running down the

10   alley. It shows one officers ahead of the other officer and

11   then they swapped. One officer is a little faster than the

12   other. I think Officer Solano got there first. He sped ahead

13   of Officer Encarnacion.

14         They were running down the alley. They turned right.

15   Officer Solano turned right. The footage shows Officer Solano

16   shoot Alvarez. It happened awfully quickly, but you can see

17   Officer Solano with his gun. You can see Alvarez lying on the

18   ground, unfortunately. The footage also shows Encarnacion

19   arriving on the scene a few seconds later when Alvarez was

20   already on the ground.

21         Officer Encarnacion argues that the body-cam footage

22   shows that the shooting started and ended in a flash,

23   literally and figuratively. According to him, the whole thing

24   was over in about a second.

25         So Officer Encarnacion says that the videos prove

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 28 of 57 PageID #:1110
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 29 of 58 PageID #:337

28

1  that he didn't have a realistic chance to get in the middle of

2  things.

3         Before I get into the merits of that, I need to talk

4  about a threshold question.  The question is whether this

5  Court can consider the videos at the motion to dismiss stage

6  at all.  That's the antecedent question.

7         In other words, I've got an argument in front of me

8  about the body-cam footage.  So I have to think to myself, can

9  I even consider that.

10         On a motion to dismiss, Courts generally stick close

11  to the pleadings, as they're required to do.  They don't stray

12  very far.  Courts are not in the business of diving into the

13  record which does not exist, after all.

14         Instead focus -- Courts focus on the complaint.  They

15  see if the complaint gives the defendant fair notice about

16  what the complaint is about.

17         Sometimes Courts do consider extrinsic evidence at

18  the motion to dismiss stage, meaning material that is outside

19  the statements in the complaint itself.  For example, Courts

20  may consider "documents incorporated into the complaint by

21  reference, and matters of which a court may take judicial

22  notice."  See *Smykla v. Molinaroli*, 85 F.4th 1228 at

23  Page 1235, Seventh Circuit 2023.

24         Under the incorporation by reference doctrine, "if a

25  plaintiff mentions a document in his complaint, the defendant

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 29 of 57 PageID #:1111
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 30 of 58 PageID #:338

29

1   may then submit the document to the court without converting

2   defendant's 12(b)(6) motion to a motion for summary judgment."

3   I'm quoting *Brownmark Films, LLC, v. Comedy Partners*, 682 F.3d

4   687, 690, Seventh Circuit 2012.

5          "The doctrine prevents a plaintiff from evading

6   dismissal under Rule 12(b)(6) simply by failing to attach to

7   his complaint a document that proves his claim has no merit."

8   *Id.*

9          The doctrine is a narrow exception, as the Seventh

10   Circuit pointed out in the *Levenstein* case, 164 F.3d at

11   Page 347.  It does not "grant litigants license to ignore the

12   distinction between motions to dismiss and motions for summary

13   judgment."  *Id.*

14          Indeed, if a district court strays too far from the

15   path and considers extrinsic material, it can spring Rule

16   12(d) into life.  In that case, the Court must treat the

17   motion as a motion for summary judgment and give all parties

18   an opportunity to present the material that they want to

19   present.  That's what Rule 12(d) says.

20          In sum, an exhibit that goes outside the pleadings

21   can only -- let me say that again.

22          In sum, a Court can consider a document that is

23   outside the pleadings, but only in narrow circumstances.

24   Typically, it's a document that is referenced in the complaint

25   and is central to the complaint or sometimes it involves

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 30 of 57 PageID #:1112
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 31 of 58 PageID #:339

30

1   material that's outside the complaint that the Court can take

2   judicial notice of.  That's the concept.

3           If the complaint itself references a document and

4   it's central to the claim and "incontrovertibly contradicts"

5   the complaint, the exhibit will control the motion to dismiss.

6   That's what the Seventh Circuit in the *Bogie* case, 705 F.3d at

7   609.

8           Judge Kness gave a helpful summary of the law, as he

9   often does, when addressing this issue in the *Flores* case.

10  Judge Kness summarized the law about body-cam footage at the

11  motion to dismiss stage.  Take a look at *Flores Delgado v.*

12  *City of Chicago*, 547 F.Supp.3d 824 at Page 831, Northern

13  District of Illinois 2021.

14          Let me read just you a paragraph from Judge Kness's

15  opinion because I think he captured it well.

16          "At this stage, the Court reviews the complaint and

17  all exhibits attached to the complaint.  In doing so, the

18  Court accepts the plaintiff's allegations as true and

19  construes all inferences in the plaintiff's favor.  But the

20  Court is free to consider any fact set forth in the complaint

21  that undermine the plaintiff's claim.  This distinction

22  includes exhibits attached to the complaint such as video

23  recordings attached to or referenced in a complaint.

24  Accordingly, when a video attached to or referred to in a

25  complaint clearly contradicts the plaintiff's allegation, the

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 31 of 57 PageID #:1113
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 32 of 58 PageID #:340

31

1    video controls."

2              Justice Scalia had a nice line on this a couple of

3    years ago, incidentally.

4              So the first question I have to consider is whether

5    the second amended complaint refers to the body-cam footage.

6    That question is a little bit tricky.  At first glance, the

7    complaint seems to imply that the body-cam footage does not

8    exist even though I think we all know it does exist.  Right?

9              The complaint alleges that the officer defendants

10   "did not activate their body-worn cameras while they were

11   driving."  I'm quoting there the second amended complaint,

12   Paragraph 21, also Paragraph 25.

13             So there's not much of a foothold in the complaint

14   for the second -- in the complaint about the body-cam footage.

15   The estate's response brief does tighten its position.  The

16   estate acknowledges that the footage does exist.  According to

17   the estate, the complaint "did not imply that there was no

18   police camera footage of this incident.  There obviously is."

19   I'm quoting the Page 9, Footnote 2, Docket No. 8.

20             The estate went on to explain its stance.  "What

21   defendants did, contrary to their training and CPD policy, was

22   delay activating their body cameras."

23             At this point, the estate explains, it can't say

24   whether the delay was "intentional."

25             So there was just a little bit in the second amended

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 32 of 57 PageID #:1114
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 33 of 58 PageID #:341

32

1    complaint about the body-cam footage.  In the response brief,

2    the estate acknowledged that the videos existed but says there

3    may have been an issue about when they were turned on.

4            In other words, the estate acknowledges that the

5    body-cam footage exists.  But the question is not whether the

6    videos exist.  The Court can see for itself that the videos

7    exist.  The question is not whether this estate admits that

8    they exist.  The estate obviously admits that they exist.

9            The question for me is whether the second amended

10   complaint itself points to the body-cam footage.  That's what

11   I have to decide.  And here, there really just is not that

12   much of a foothold.  There is an inkling, but there's not

13   really much of a foothold to stand on in the second amended

14   complaint about the body-cam footage.

15           At the end of the day, even if the complaint did

16   reference the videos, I cannot say at this point that the

17   videos are central to the estate's claim.  The reality is that

18   the videos are evidence of what happened, but it's not

19   immediately clear to this Court at this early stage that the

20   videos are central to the claim.

21           Central -- the word "central" does not simply mean

22   important.  It typically means that it's the whole shebang.

23   For example, the Seventh Circuit has said "the usual example"

24   of an exhibit that is central to a claim is a contract in a

25   breach of contract case.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 33 of 57 PageID #:1115
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 34 of 58 PageID #:342

33

1    So a document that is central to the claim means

2    something more than an important piece of evidence.  That's

3    how I read the Seventh Circuit's opinion in the case of

4    *Tierney v. Vahle*, 304 F.3d 734 at 738, Seventh Circuit 2002.

5    The videos don't seem to satisfy that standard.  The

6    Court has no doubt that the videos "will provide key insights"

7    into what went down and how it went down.  I'm quoting the

8    *Brown* case, 8 -- excuse me -- 594 F.Supp.3d 1021 at 1030,

9    Northern District of Illinois 2022.

10    But the videos at this early stage don't stand alone

11    "dispositive of the facts at issue."  That's another way of

12    saying that the videos are part of the story, but it remains

13    to be seen what I haven't seen.

14    After all, the estate's theory is that the defendant

15    officers deliberately delayed turning on their body-cam

16    footage.  It is conceivable that what happened before the tape

17    started rolling might become relevant.  I'm not frankly sure.

18    This Court is leery of short-circuiting the fact-gathering

19    process.  The complaint does do enough to put Officer

20    Encarnacion on notice.  So with some reluctance, I'm going to

21    say that even though I have watched the body-cam footage, I am

22    not going to say at this point that the body-cam footage is

23    enough at the motion to dismiss stage to knock out the failure

24    to intervene claim against Officer Encarnacion.

25    But let me say this:  I watched the videos

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 34 of 57 PageID #:1116
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 35 of 58 PageID #:343

34

1   personally.  I have a hard time seeing how the estate can

2   bring a failure to intervene claim against Officer Encarnacion

3   based on the shooting by Officer Solano.

4           Here's what I see:  There was a foot chase.  The

5   videos showed that Officer Encarnacion was in the lead first,

6   but apparently Officer Solano is faster or maybe he's got more

7   endurance.  I don't know.  He got there first.  Officer Solano

8   sped ahead.  He ran past Officer Encarnacion as they ran down

9   the alley.  Officer Solano and Officer Encarnacion ran down

10  the alley chasing Alvarez.  Officer Solano sped.  He ran

11  faster.  He ran by Officer Encarnacion.  Officer Solano turned

12  a corner, he turned right, and that's when he shot Officer

13  Alvarez [*sic*].  It happened quickly.  Officer Encarnacion

14  arrived a few seconds later.

15          Based on what I saw, it is hard to see how Officer

16  Encarnacion could have intervened and prevented the shooting.

17  The reality is that he was running and he got to the scene

18  second.  Officer Solano got there first.  Officer Encarnacion

19  got there second.

20          When Officer Encarnacion turned the corner, the

21  shooting had already taken place.  That's what I see.

22          I don't see how Officer Encarnacion could have

23  intervened and saved Alvarez, candidly.  I don't know.

24          That being said, I don't know what I don't know.

25  Maybe there are other facts out there that affect the

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 35 of 57 PageID #:1117
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 36 of 58 PageID #:344

35

1    analysis.  I'm going to keep my powder dry.  I'm going to keep

2    an open mind.  I've seen the videos, but I think it's a bit

3    premature for me to say just based on these videos that

4    there's no way that the plaintiff can have a claim.  At least

5    I'm not going to do that at the motion to dismiss stage.

6    Maybe I will do that at the summary judgment stage, but I'm

7    not going to prevent you from getting discovery on this.

8    That's the idea.

9         The failure to intervene claim against Officer

10   Encarnacion might not survive summary judgment.  But based on

11   what the Court has seen, it looks like a steep climb.  But

12   today is not the time for the climb.  It will come later.

13        Please understand, everyone, what I'm saying and what

14   I'm not saying.  I'm not at this point saying that the claim

15   is going to succeed or is going to fail at summary judgment.

16   I have some doubts.  I have concerns.  I have some questions.

17   But I don't have a ruling on that for you other than the

18   ruling on the motion to dismiss.

19        My job now is not whether any jury could side in

20   favor of the plaintiff.  That's not my ruling.

21        The question for me is just whether the second

22   amended complaint does enough.  And I'm presented with a

23   second amended complaint that barely mentions the body-cam

24   footage.  And after watching the body-cam footage, I think

25   there's enough there to allow discovery to go forward on that

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 36 of 57 PageID #:1118
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 37 of 58 PageID #:345

36

1   claim.

2          At the end of the day, the failure to intervene claim

3   against Officer Encarnacion might not survive, but that's not

4   a question for today.

5          So don't anyone get too excited or too disappointed.

6   I'm just keeping my powder dry.  We'll see how it shakes out.

7          It's a long way of saying this:  Officer

8   Encarnacion's motion to dismiss the failure to intervene claim

9   against him is denied.

10          I've now addressed the motions to dismiss filed by

11   the officers.

12          I'm now going to turn to the motion to dismiss filed

13   by the City of Chicago.

14          I'll start with the *Monell* claims.

15          Everyone is all too familiar with *Monell*.  For a

16   "*Monell* claim to survive a motion to dismiss, a plaintiff must

17   plead facts that plausibly suggest that, quote, she was

18   deprived of a constitutional right" -- "(1) she was deprived

19   of a constitutional right; (2) that deprivation can be traced

20   to some municipal action (*i.e.*, a policy or custom), such that

21   the challenged conduct is properly attributable to the

22   municipality itself; (3) the policy or custom demonstrates

23   municipal fault, *i.e.*, deliberate indifference; and (4) the

24   municipal action was the moving force behind the

25   federal-rights violation."  I'm quoting there *Thomas v. Neenah*

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 37 of 57 PageID #:1119
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 38 of 58 PageID #:346

37

1  *Joint School District*, 74 F.4th 521, 524, Seventh Circuit

2  2023.

3          The Seventh Circuit has delineated three different

4  types of actions that might support a municipal -- might

5  support municipal liability.  You folks know the standard.

6  Let me point you to *First Midwest Bank Guardian of Estate of*

7  *LaPorta v. City of Chicago*, 988 F.3d 978, 986, Seventh Circuit

8  2021.

9          Let me summarize the three types of actions.

10         First, a municipality might be liable if it has an

11 "express policy that caused a constitutional deprivation when

12 enforced."

13         Second, a municipality could be on the hook for "a

14 widespread practice that is so permanent and well-settled that

15 it constitutes a custom or practice."

16         Third, a municipality might be responsible when the

17 "constitutional injury was caused by a person with final

18 policy-making authority."

19         Even so, *Monell* cannot be turned into a form of

20 *respondeat superior* liability.  *Monell* is not *respondeat*

21 *superior* liability.  To avoid turning *Monell* into *respondeat*

22 *superior* liability, it is important to "distinguish between

23 the isolated wrongdoing of one or a few rogue employees and

24 other, more widespread practices."  *Howell v. Wexford Health*

25 *Sources*, 987 F.3d 647, 654, Seventh Circuit 2021.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 38 of 57 PageID #:1120
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 39 of 58 PageID #:347

38

1          The estate brings the second type of a *Monell* claim,

2     meaning a claim about a widespread practice.  It argues that

3     the City's lack of a foot chase policy led to a widespread

4     practice of problematic foot pursuits.

5          I'm going to start with that, the missing foot chase

6     policy.  That's what I'll call it.  So I'll start with the

7     foot chase policy, and then I'll talk about the failure to

8     discipline.

9          So here it goes with respect to the foot chase

10    policy.

11         The City attacks the estate's theory about the lack

12    of a policy about foot chases.  The City contends that the

13    second amended complaint has not alleged municipal fault.

14    Again, as you know, municipal fault is the third part of a

15    *Monell* claim.  In other words, a complaint must allege that

16    the policy or custom demonstrates municipal fault, *i.e.*,

17    deliberate indifference.

18         The City argues that the complaint's deliberate

19    indifference allegations are implausible.  Let me talk about

20    the standard for deliberate indifference.

21         "Deliberate indifference is a stringent standard of

22    fault."  See *Connick v. Thompson*, 563 U.S. 51 at Page 61,

23    Supreme Court 2011.  It's not an inadvertent oversight or a

24    momentary lapse or a fleeting slip-up or a goof or a gaff or a

25    mistake or a whoops.  Instead, deliberate indifference

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 39 of 57 PageID #:1121
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 40 of 58 PageID #:348

39

1   requires "proof that a municipal actor disregarded a known or

2   obvious consequence of his action."  I'm quoting there again

3   the *Connick* case.

4         In other words, a municipality shows deliberate

5   indifference when it, quote -- excuse me.  I said "quote."  I

6   didn't mean "quote."

7         Let me say that again.

8         In other words, a municipality shows deliberate

9   indifference when it, number one, fails to provide adequate

10  training in light of foreseeable consequences; or, two, fails

11  to act in response to repeated complaints of constitutional

12  violations by its officers.  See *Miranda v. County of Lake*,

13  900 F.3d 335, 345, Seventh Circuit 2018.

14        The City argues that it didn't fail to do anything.

15  According to the City, it didn't sit on its hands.  In its

16  view, the City took active steps to address foot pursuits.  To

17  support its argument, the City offers excerpts from the

18  independent monitor's reports.  Again, remember, the

19  independent monitor provides periodic updates about the City's

20  progress under a consent decree.

21        According to the City, it has received glowing report

22  cards.  The independent monitor "commended CPD for making

23  considerable progress toward tracking and analyzing the

24  frequency of foot pursuits."  I'm quoting there Page 6 of the

25  City's brief, Docket No. 87.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 40 of 57 PageID #:1122
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 41 of 58 PageID #:349

40

1    So the City seeks dismissal based on the independent

2    monitor's report.  The City believes that it's fair game to

3    consider the independent monitor report under a theory of

4    incorporation by reference.  They point this out at Page 3 of

5    their brief, Footnote 5.

6    Again, as a refresher, the incorporation of a

7    reference doctrine comes into play when a document is

8    referenced in the complaint and is central to the claim.  So

9    this has to do again with the antecedent question of whether I

10   consider -- can consider something that's outside the four

11   corners of the complaint.

12   Here, the first prong looks to be satisfied.  The

13   estate's complaint mentions the independent monitor's report.

14   Take a look at Page 100 and 101.

15   But at this early stage, the Court doubts that the

16   report is central to the claim.  It doesn't appear that the

17   monitor's report is akin to a contract on a claim for a breach

18   of contract.  But even if this Court were to consider the

19   report, this Court cannot definitively declare at the motion

20   to dismiss stage that the report "incontrovertibly

21   contradicts" the complaint's allegations.  See *Bogie*, 705 F.3d

22   at 609.

23   That's a difficult standard to meet.  The concept is

24   whether it torpedos the claim indisputably, whether it sinks

25   it, whether it's doomed to fail.  It's sort of like whether

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 41 of 57 PageID #:1123
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 42 of 58 PageID #:350

41

1   the complaint defeats itself, whether it's self-defeating by

2   embedding a hand grenade in itself, so to speak.

3          The complaint offers a less rosy picture of the

4   independent monitor report than the picture that is painted by

5   the City.

6          The second amended complaint alleges that the

7   independent monitor report concludes that the City "failed to

8   reach full compliance in developing a supplemental foot

9   pursuit training bulletin that reflects best practices from

10   foot pursuit policies in other jurisdictions." I'm quoting

11   there Paragraph 101 of the second amended complaint.

12          The complaint also alleges that Officer Solano and

13   Officer Encarnacion "claimed they received no meaningful

14   training as to how to conduct a foot chase." I'm quoting

15   there Paragraph 39 of the second amended complaint.

16          Here's the bottom line: The Court declines the

17   invitation at the motion to dismiss stage to parse the content

18   of the independent monitor report.

19          The defense team has pointed to the independent

20   monitor report saying that it's progress. The complaint says

21   that the existence of progress is not enough because the City

22   has not yet arrived. It is difficult for me to sort that out

23   at the motion to dismiss. I need to hear more.

24          Maybe the defense will prevail on summary judgment on

25   this point, and maybe they won't. I don't know.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 42 of 57 PageID #:1124
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 43 of 58 PageID #:351

42

1    I am reluctant at the motion to dismiss stage to say

2    that the portions cited by the City in their report are

3    sufficient to doom the claim from the get-go.  So it's a

4    limited ruling.

5        For now, at this early stage, the second amended

6    complaint does enough to put the ball in play when it comes to

7    the foot chase policy.  So the motion to dismiss, that portion

8    of the motion -- of the *Monell* claim is denied.

9        There is one more *Monell* theory that's on the table.

10   The estate theorizes that the City's "failure to supervise and

11   discipline has led to a police culture of impunity."  I'm

12   quoting there Paragraphs 107 to 131 of the second amended

13   complaint.

14       The City argues that the estate failed to plausibly

15   allege a widespread practice.  To recap, a city can be held

16   liable under Section 1983 for a "common practice that is so

17   widespread and well-settled that it constitutes a custom or

18   usage with the force of law even though it's not authorized by

19   written law or express policy."

20       Only a widespread practice counts.  A practice must

21   infect "a critical mass of an institutional body."  The

22   practice must be a pandemic.  It's not just one sick person.

23   It's sick people.  Widespread.

24       That's a metaphor.

25       "The Seventh Circuit has not adopted any bright-line

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 43 of 57 PageID #:1125
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 44 of 58 PageID #:352

43

1    rules defining custom or practice, but it has found that" a

2    practice requires "more than one instance." See *Black v. City*

3    *of Chicago*, 2022 WL 425586 at Page 5, Northern District of

4    Illinois 2022.

5          I was citing there *Thomas v. Cook County Sheriff's*

6    *Department*, 604 F.3d 292 at 303, Seventh Circuit 2010.

7          "The other incidents need to be sufficiently similar

8    to support an inference of a broader pattern."

9          "The greater the dissimilarity, the greater the

10   skepticism that there is a single actionable municipal

11   practice or custom."

12         Here, the estate offers a second amended complaint

13   with some examples.  The estate's second amended complaint

14   points to two specific instances of an alleged failure to

15   discipline.  The estate alleges that "Officer Solano still had

16   his gun and badge months after he shot Alvarez."  Take a look

17   at Paragraph 127 of the complaint.

18         According to the complaint, Officer Solano "pulled

19   his gun on another motorist during a road rage incident."

20         The estate also focuses on Officer Encarnacion.

21   According to the complaint, Officer Encarnacion "has long been

22   known as a dangerous and loose cannon, yet he was still a City

23   employee when Anthony Alvarez was killed."  I'm quoting there

24   Paragraph 128.

25         Those are examples, but those are only examples.  Let

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 44 of 57 PageID #:1126
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 45 of 58 PageID #:353

44

1   me remind you of the standard.

2            The standard is a widespread practice.  I kind of

3   like the pandemic metaphor, which I just came up with on the

4   fly here.  It's not just one or two sick people.  It's like we

5   need a widespread sickness.

6            You've got to look beyond what's right in front of

7   your nose.

8            Beyond the two specific instances, meaning the two

9   officers in question, Officer Solano and Officer Encarnacion,

10  the second amended complaint does offer more, but not a lot

11  more.  The second amended complaint goes back in time and

12  points to an almost decade's old statement by an old mayor.

13  The complaint says that in December of 2015, "Chicago Mayor

14  Rahm Emanuel acknowledged the existence of this Code of

15  Silence within the Chicago Police Department."  That's

16  Paragraph 112 of the second amended complaint.

17           The complaint also points to a report from the

18  Department of Justice in 2017.  The report found that the

19  Chicago Police Department failed to "review and investigate

20  officer use of force," which "helped create a culture in which

21  officers expect to use force and not be questioned about the

22  need for or propriety of that use."  That's Paragraph 115.

23           Basically, when it comes to the allegation about

24  discipline, the second amended complaint does not bring very

25  much to the table.  The estate alleges that the two officers

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 45 of 57 PageID #:1127
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 46 of 58 PageID #:354

45

1    didn't receive discipline.  That's something, but that's not

2    enough.  That isn't enough to establish a widespread practice.

3            Beyond that, the estate points to one statement by a

4    mayor a couple of mayors ago.  Mayor Emanuel is no longer

5    Mayor Emanuel.  He is Embassador Emanuel.  He is in Japan

6    right now representing his country.

7            That's a statement from 2015.  It is now 2024.

8    That's nine years ago.  There's been a lot of water under the

9    bridge, literally and figuratively.

10           Apart from the isolated statement by a couple of

11   mayors ago, almost a decade ago, the second amended complaint

12   points to a DOJ report from 2017.  The incident in question

13   took place in 2021, four years later.  Four years.  That's a

14   span of time equal to a presidential term.  A lot of time has

15   passed between 2017 and 2021.  To bridge the gap, a plaintiff

16   must allege factual content to give rise to a reasonable

17   inference that problems then were problems now.  And when I

18   mean now, I mean now at the time of the second amended

19   complaint.

20           The more time that passes, the more facts that a

21   complaint must muster to give rise to a plausible inference.

22   Facts about the past can only get you so far.

23           Here, the second amended complaint doesn't really do

24   it.  The second amended complaint points to the DOJ report

25   from 2017, as many complaints in this building do.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 46 of 57 PageID #:1128
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 47 of 58 PageID #:355

46

1    I have concerns about the life span of the DOJ report

2   from 2017.  At some point it can't be good enough just to cite

3   the DOJ report from 2017.  What I think happens in this

4   courthouse is people roll into the courthouse with a complaint

5   that invokes the DOJ report from 2017, and they think that

6   gets over the *Monell* hump.

7        As I see things, the more time that passes, the more

8   you've got to add to get over the hump.  The hump gets bigger.

9   It's like the Rocky Mountains.  It's rising with the time.

10       If it's enough to simply cite the 2017 report from

11  the Department of Justice, a *Monell* claim would be near

12  automatic.  It would be the standard way of doing things.  It

13  would be just almost automatic in every case against the City.

14  The prohibition on vicarious liability would be out the

15  window, basically.

16       Here's what I'm trying to say:  At some point, it

17  can't just be good enough to cite the 2017 DOJ report.  We're

18  now in 2024.  The events here took place in 2021.  To get over

19  the hump of *Monell*, a plaintiff has to allege that there was a

20  widespread practice.  I don't think it's enough just to cite

21  the DOJ report from 2017.

22       The allegations of the complaint when it comes to a

23  widespread practice about lack of discipline are too general,

24  they're too vague, they're too old.  There's not a lot there.

25  It made me think frankly, who won the Super Bowl in 2017?

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 47 of 57 PageID #:1129
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 48 of 58 PageID #:356

47

1  Anybody know?  What was best picture?  Anybody know?  World

2  Series, anybody?

3       That was two years after the Blackhawks last won the

4  Stanley Cup.  That, I remember.

5       I bet there's nobody on the Chicago Bears right now

6  who was on the Chicago Bears in 2017.  Who was the coach of

7  the Chicago Bulls in 2017?  Does anybody know?  I have no

8  idea.

9       Who was the best player on the Cubs or the White Sox

10  in 2017?  Anybody know?  I couldn't tell you in 2021, and I've

11  been trying to pay attention to these things.

12       Here's the point:  The more time that passes, the

13  more stale things get.  The more time that passes, the weaker

14  the inference about old material.

15       To get over the hump from *Monell*, I do think that the

16  complaint here needs to allege more facts about a widespread

17  practice about a failure to discipline.

18       I'm not saying that a complaint couldn't do it.  I'm

19  simply saying that the second amended complaint hasn't done

20  it.  In my view, the second amended complaint does not do

21  enough to state a claim under *Monell* about a widespread

22  practice for a lack of discipline.  So the *Monell* claim about

23  the lack of discipline is dismissed.

24       Finally, I'm going to turn to the state law claims.

25  The City asked the Court to dismiss the estate's claims under

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 48 of 57 PageID #:1130
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 49 of 58 PageID #:357

48

1   the Illinois Wrongful Death Act and the Survival Act.

2         Specifically, the City argues that it's immune from

3   liability under the Illinois Tort Immunity Act.

4         The estate responded.  Candidly, the estate's

5   response was difficult to parse.  I mean that in the nicest

6   possible way.  Please take it in that spirit.  I was not a

7   hundred percent sure what the position was, candidly.

8         The estate explains that it "agrees that

9   Section 2-201 immunizes Defendant from acts and omissions in

10   determining policy under Illinois law as to Illinois state law

11   claims.  Plaintiff's policy claim is her Section 1983 *Monell*

12   liability claim.  Plaintiff at this time is not aware of my

13   any ministerial failures by the City of Chicago.  However,

14   Plaintiff can examine how City policy affected Defendants in

15   the Complaint for Counts in addition to *Monell*."  I'm quoting

16   there the plaintiff's response brief at Page 15.

17         Candidly, I'm not a hundred percent sure what that

18   means.  I'm interpreting the estate's response to concede that

19   it has not alleged a claim under the Wrongful Death Act or the

20   Survival Act against the City.  I frankly don't know how else

21   to read the estate's response.  After all, the estate labels

22   its paragraph with the header "Plaintiff has not brought state

23   law policy claims."  So that's the header.

24         If I am misunderstanding your position, I'll give you

25   leave to amend.  I will.  But as I see things, I'm going to

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 49 of 57 PageID #:1131
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 50 of 58 PageID #:358

49

1   grant the City's motion to dismiss the Illinois Wrongful Death

2   Act claim and the Survival Act claims against the City.

3         In other words, I'm just going based on what I see

4   here and as I understand your position.  If I'm missing

5   something, file a motion, ask for leave to amend and I'll give

6   it to you.  Okay?  I really will.

7         So here's the conclusion, folks:  I'm going to grant

8   in part and deny in part the motions to dismiss.  The

9   excessive force claim against Officer Solano obviously

10  survives.  For now, the Fourth Amendment failure to intervene

11  claim against Officer Encarnacion survives as well.  The

12  Fourth Amendment claims are otherwise dismissed, meaning the

13  claims about the approach of the vehicle and about the foot

14  chase.

15        The City's motion to dismiss is granted in part and

16  denied in part.  The *Monell* claim can go forward in part.  The

17  *Monell* claim can go forward as to the claim about the foot

18  chase policy.  The *Monell* claim is not going forward as

19  alleged about the lack of discipline for officers generally.

20        I'm dismissing the claims under state law against the

21  City.

22        So that's the ruling.

23        So, folks, I don't know what's the most sore, your

24  ears, my court reporter's fingers, or my throat.  It's

25  probably a three-way tie.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 50 of 57 PageID #:1132
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 51 of 58 PageID #:359

50

1          Let me say this.  Thank you for your patience.  I

2    know it's hard to sit there.  I know it's hard to sit there

3    and just digest a ruling orally.  I'm a visual learner.  I

4    like seeing things.  It's hard for me to get it in oral format

5    sometimes.  So I'm sympathetic if you want a written report.

6    You can order the transcript.

7          I cannot say enough how burdened district courts are

8    in this district.  I think that there is, candidly, an

9    information gap between the bench and the bar in terms of how

10   many things are on a district court's plate in this district

11   and how besieged everyone is.  I don't think that message is

12   getting out.  I think people are working incredibly hard, and

13   I wish I could give you a written ruling, again.

14         I would not be surprised if I give you a ruling some

15   day on something else, but I cannot give you a written ruling

16   on everything.  It was just quicker for me to give you this

17   written ruling.  If I had to proof it and get it

18   spit-polished, it probably would have taken me an extra day.

19   And when I've got 3 to 400 cases, if I give everybody an extra

20   day, it really adds up.  So thank you for indulging me on

21   that.

22         So that's the ruling, everybody.  I know there is a

23   lot to digest.

24         Can we talk about discovery?  I meant to look at the

25   docket before I came up here.  You know, I have a standing

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 51 of 57 PageID #:1133
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 52 of 58 PageID #:360

51

1    order that talks about discovery.  I say that a motion to

2    dismiss doesn't put discovery on ice.  I candidly didn't

3    double-check to see if I had stayed discovery.  I assume I

4    didn't.  I don't remember, candidly.  So do you want to tell

5    me -- maybe you have it -- I'm being as straight with you as I

6    can.  I can't remember if discovery is going forward.  I just

7    didn't -- do you guys want to come on up to and talk to me.

8              MR. SMITH:  The fact discovery is basically complete.

9              THE COURT:  Okay.

10             MR. SMITH:  There is one issue that's been out there

11   pending and really deals with 404(b) and 608 witnesses who are

12   not the fact witnesses of this case.  That's awaiting a

13   ruling.

14             That -- the experts are affected a little bit by your

15   ruling on the *Monell*.  There probably will be one *Monell*

16   expert coming from the plaintiff.

17             THE COURT:  Okay.

18             MR. SMITH:  I think it's really about *Monell*

19   discovery at this point, scheduling that.  Given -- in light

20   of Your Honor's ruling, I think it's much more focused given

21   the fact that it is directly on the foot chase policies and

22   trainings.

23             THE COURT:  Did I stay discovery on *Monell*?

24             MR. SMITH:  We did stay it.

25             THE COURT:  So that will be unstayed.  I typically

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 52 of 57 PageID #:1134
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 53 of 58 PageID #:361

52

1    stay it pending a ruling.  So it will be unstayed for -- to

2    the extent that it isn't -- any objection to that, to

3    unstaying discovery?

4            MS. ROMELFANGER:  Your Honor --

5            THE COURT:  Or do you want to -- I mean, sometimes I

6    -- I've done it differently, actually, as I think about it.

7            Go ahead.

8            MS. ROMELFANGER:  So I think we are -- the City is

9    going to plan to file a motion to stay and bifurcate *Monell*.

10           THE COURT:  Yeah.

11           MS. ROMELFANGER:  We obviously have to answer the

12   complaint and do that --

13           THE COURT:  Right.

14           MS. ROMELFANGER:  -- but we do intend to do that,

15   Your Honor.

16           THE COURT:  Okay.  So why don't we do this.  I

17   will -- I will leave the stay in place for now subject to the

18   fact that you all have to digest what I've just ruled, and you

19   should talk it over.  If people want to keep it stayed, you

20   can file a motion.  If people want to lift to stay, you can

21   file a motion.  But I'll give you a chance to talk it over.

22           Is that fair, everybody?

23           You've got to digest things, what you just heard.

24           MS. ROMELFANGER:  Yes, Judge.

25           THE COURT:  You know, I've done different things in

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 53 of 57 PageID #:1135
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 54 of 58 PageID #:362

53

1   different cases depending on the needs of the case. So I'll

2   give you a chance to soak it up and think it over and talk it

3   through.

4          MR. SMITH: Okay. I can say off the bat, though, we

5   would -- we're going to oppose a stay. We do believe,

6   especially in light of Your Honor's ruling, that bifurcation

7   doesn't make sense and we should go forward on a very limited

8   direct *Monell* discovery path and that's what we should start

9   discussing.

10         I do think that that would -- having a conference and

11   really setting out for Your Honor what that would entail

12   beforehand, before we, you know, set dates and things like

13   that, would be beneficial. We'd like to get too starting that

14   type of conference situation.

15         THE COURT: Okay. Well, I understand all that. Why

16   don't you talk it through. And do you want to file a status

17   report? Do you want to do that? Like, do you want to take a

18   week or ten days or something like that?

19         MR. SMITH: Sure.

20         THE COURT: About a week from Monday; is that good?

21         MS. ROMELFANGER: That works, Judge.

22         THE COURT: Is that okay? Just file a status. Like

23   talk it through. Let me know what you think. And if you all

24   disagree on things, you can put it in there. If you agree on

25   things, that's fine, too.

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 54 of 57 PageID #:1136
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 55 of 58 PageID #:363

54

1       MR. GAINER:  Can I add something, Judge?

2       THE COURT:  Yeah, you can add whatever you'd like.

3       MR. GAINER:  Not *Monell* related --

4       THE COURT:  Yeah.

5       MR. GAINER:  -- because I represent the individuals.

6       THE COURT:  Yeah.

7       MR. GAINER:  So Chris mentioned -- counsel mentioned

8    that there are some other 404(b)-related things that are

9    specific to the individual claims that still have to be ironed

10   out.

11       I just want to put that out there that I think your

12   ruling sort of affects those things based on the dismissal of

13   the *Monell* claim related to the failure to supervise and train

14   and whether or not certain things about these officers' past

15   are relevant to anything.  I'm not suggesting that we need to

16   argue that now.

17       THE COURT:  Yeah.

18       MR. GAINER:  I'm just pointing out that I think the

19   status report that you're contemplating probably needs to

20   include something about that, too, so we can figure out where

21   we're going next.

22       THE COURT:  Yeah, why don't you talk that through.

23       So I'm going to read you between the lines and guess

24   that maybe the officers have had a few bumps in the road along

25   the way and they've been accused of various things and, you

1  know, the plaintiff thinks that they can use that at trial and

2  you think it's character evidence or propensity evidence and

3  ought not come in.

4          That's what we're talking about?

5          MR. GAINER:  That's exactly what we're talking about.

6          THE COURT:  That's fine.

7          So talk that through and then let me know if you need

8  to tee it up or if you need a ruling, you know, if you need a

9  briefing schedule, whatever you need.

10          MS. ROMELFANGER:  And just so you know, Your Honor,

11 there is a motion to compel regarding that issue that has been

12 fully briefed --

13          THE COURT:  Okay.

14          MS. ROMELFANGER:  -- by the parties.  I think that's

15 what counsel --

16          MR. GAINER:  Yeah, I think that's all part of it.

17          THE COURT:  Okay.

18          MR. GAINER:  I think it's all part of the same thing.

19          THE COURT:  Okay.  Very good.

20          Okay.  Why don't you do this:  Why don't you file a

21 status report a week from Monday.

22          Is that enough time, everybody?

23          MR. GAINER:  Yes.

24          MS. ROMELFANGER:  Yes, Judge.

25          THE COURT:  And just see if you can figure out the

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 56 of 57 PageID #:1138
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 57 of 58 PageID #:365

56

1 lay of the land and agree on what you can agree on and let me

2 know what you disagree on and maybe propose a path forward.

3    If -- as I said, I meant to double-check the docket

4 before coming up here, so I didn't see that there was that

5 pending motion, but I'll do that and I'll get you a ruling as

6 quick as I can.

7    MR. SMITH:  Thank you, Your Honor.

8    THE COURT:  What do you think?  Any other --

9    MR. GAINER:  Kris Bryant was the best player on the

10 Cubs in 2017.

11    THE COURT:  That's probably correct.  And my local

12 Cubs fan could tell you that.  That's probably -- that was

13 probably not the hardest question I asked today.

14    I -- not to get into the merits here, but I do think

15 that people have gotten a lot of mileage out of the 2017

16 Department of Justice report.  Every tire runs out of tread,

17 and I wonder if all of the mileage has gotten out of the 2017

18 DOJ report.  I don't know.

19    At some point it's got to have a half-life or a shelf

20 life or a *Monell* life.  And that may have ended.  I don't

21 know.  I just -- I'm telling you that's how I see things.  I

22 think we need -- at some point we need more, and I think that

23 point is now, in my judgment.

24    Okay.  So I'll look forward to getting your report.

25    Thank you, again, for sitting with me -- sitting down

Case: 1:22-cv-00964 Document #: 126 Filed: 03/11/24 Page 57 of 57 PageID #:1139
Case: 1:24-cv-09015 Document #: 28-1 Filed: 12/31/24 Page 58 of 58 PageID #:366

57

1  and bearing with me on the ruling.

2          Anything else you all want to cover today?

3          MR. GAINER:  I have nothing.  Thank you very much.

4          THE COURT:  Okay.  Anything from you?

5          MS. ROMELFANGER:  Nothing, Judge.

6          THE COURT:  Anything?

7          MR. SMITH:  Nothing, Judge.

8          THE COURT:  I appreciate you folks coming in.  I know

9  getting on the suit is a little different than how you've been

10 doing things these days probably.

11         MR. GAINER:  You have no idea.

12         THE COURT:  Well, I have some idea.

13         I appreciate you making the effort to come down to

14 the Dirksen Federal Building.  Nice to see you.

15         MS. ROMELFANGER:  Thank you, Judge.

16         (Which were all the proceedings heard.)

17                     *   *   *   *   *   *

18                         CERTIFICATE

19      I certify that the foregoing is a correct transcript from

20 the record of proceedings in the above-entitled matter.

21

22 /s/ *Amy Kleynhans*              *3/1/2024*
   _____    _____
23 Amy Kleynhans, CSR, RPR, CRR    Date
   Official Court Reporter

24

25